J. MILTON SOREM AND WANDA M. SOREM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

R. W. BOOGAART AND MARGARET BOOGAART, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93586, 94707. Filed May 3, 1963

*Thomas J. Kennedy*, for the petitioners.
*Edward E. Pigg*, for the respondent.

WITHEY, *Judge:* Respondent determined the following deficiencies in the income tax of petitioners for the year 1958:

| Docket No. | Petitioners | Deficiency |
| --- | --- | --- |
| 93586 | J. Milton and Wanda M. Sorem | $17,790.06 |
| 94707 | R. W. and Margaret Boogaart | 18,550.09 |

Pursuant to petitioners' motion, both cases were consolidated for trial.

The sole issue for decision is whether the transfer by petitioners [1] Boogaart and Sorem of all of the stock of four corporations of which they were the sole owners to Boogaart Supply Co., Inc., of which they were major stockholders, in exchange for cash and cancellation of indebtedness is to be categorized as a distribution in redemption of stock within the meaning of section 302(a) of the Internal Revenue Code of 1954 [2] or as a distribution of property to which section 301 of that Code applies.

### FINDINGS OF FACT

Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by reference.

---

[1] As used in this opinion the term "petitioners" refers only to J. Milton Sorem and R. W. Boogaart, and not to the wives of either of them unless so stated.

[2] All references herein are to the Internal Revenue Code of 1954 except as otherwise specified.

J. Milton Sorem and Wanda M. Sorem are husband and wife residing in Concordia, Kans. Their joint return for the year 1958, made on the cash basis and for the calendar year period, was filed with the district director of internal revenue, Wichita, Kans. R. W. and Margaret Boogaart are also husband and wife and presently reside in Buenos Aires, Argentina. For the calendar year 1958 their joint return, made on the cash basis, was filed with the director of international operations, Washington, D.C.

Petitioners Sorem and Boogaart are brothers-in-law. In 1935, they, together with M. Boogaart, R. W. Boogaart's father, formed a partnership, known as the Boogaart Supply Co. and sometimes hereinafter called the partnership, for the purpose of engaging in the retail grocery business in the northwestern Kansas area. Subsequent to its formation the business of the partners prospered, and by 1949 the partnership owned outright four retail grocery stores located at Concordia, Clay Center, Marysville, and Washington, Kans., and had varying interests in several other grocery outlets in the surrounding area.

During the formative period 1935 to 1949 the partnership had engaged only in the retail aspect of the grocery business. However, by 1949 it was becoming increasingly apparent that expansion was necessary in order to meet the growing competition of national grocery chains with their direct lines of supply to manufacturers. The partners therefore decided to enter the wholesale grocery business with a view to obtaining similar access to manufacturers for their stores. To this end the partnership, in 1949, caused the formation of the Boogaart Supply Co., Inc. (sometimes hereinafter called the corporation), a Kansas corporation to which the partnership contributed $240,000 capital in exchange for stock.

At the beginning, the corporation dealt only in the sale at wholesale of dry nonperishable groceries. However, consistent with their expansion policy, the partners, between 1952 and 1957, acquired or caused to be formed a number of subsidiary companies to engage in the sale or production at wholesale of frozen and fresh foods, ice cream, dairy products, bakery products, drugs, housewares, eggs, and meat and poultry products, all of which subsidiary wholesale companies they eventually transferred to the corporation in exchange for corporate stock.

In 1956 M. Boogaart, the patriarch of the Boogaart-Sorem group, died. R. W. Boogaart and J. Milton Sorem thereafter acquired in equal shares M. Boogaart's partnership interest from the Boogaart estate, each having to borrow the necessary funds from third parties in order to make up the purchase price. R. W. was able to repay his loan with moneys received by him as an heir of M. Boogaart. However, J. Milton Sorem repaid his loan by borrowing $30,000 from the corporation, a debt he continued to owe the corporation until sometime in 1959.

So successful had been the partners' operation of their business that in 1957 the services of R. W. Boogaart were requested by the International Basic Economy Corp., a Rockefeller Foundation group, to organize and operate American-style supermarkets in Italy. As a result of R. W.'s decision to accept this offer, which would require his absence from the United States for an extended period of time, the partnership determined to cease operation of the four retail grocery stores located at Concordia, Clay Center, Marysville, and Washington, Kans., in the partnership form. Accordingly, on April 1, 1957, the partnership incorporated each of the four grocery stores and received 100 percent of their stock.

Despite rapid and extensive growth the expansion of various Boogaart interests had been hampered by a lack of sufficient working capital during the period 1950 to 1958. Neither the corporation nor the partnership had open credit with banks; all borrowings had been on a first mortgage secured note basis upon which the partners were individually liable. The Boogaart Supply Co., Inc., had raised, in 1954 and 1955, $370,000 through the public sale of debentures. By 1958, however, the need for still further capital to finance, among others, building of a new meat warehouse and new retail outlets for which ground had already been obtained was becoming acute. Additionally, some $90,000 in debentures which had been issued in 1954 were to reach maturity within a period of months.

Investment counsel was consulted by the corporation. It was determined that debt financing by means of debentures as a method of securing capital was inadvisable due to the already overburdened debt structure of the corporation at this time. Investment counsel advised equity financing by means of a public sale of stock, but cautioned— in fact required as terms of any prospective underwriting—that the balance sheet picture of the corporation be improved by the addition to the corporation as subsidiaries of the four profitable grocery stores still owned by the partnership. Accordingly, it was proposed to the corporation that it acquire from the partnership the four grocery store corporations by means of acquiring their stock in exchange for Boogaart Supply Co., Inc., stock. Consequently, a stock-for-stock offer was made to the partnership, but petitioner Sorem, being still indebted to the corporation for $30,000 which he had borrowed in 1957, was unwilling to transfer his partnership interest in the four grocery stores in exchange for corporate stock. He was agreeable, however, to a redemption of his stock interest for cash, and it was therefore determined that the corporation would purchase the grocery store stock from petitioners.

On September 26, 1958, all the stock of the four grocery store corporations, registered in the name of the Boogaart Supply Co. partnership, was transferred to petitioners J. Milton Sorem and R. W. Boogaart in equal shares, so that after the transfer each of the peti-

tioners held in his own name 50 percent of the outstanding stock of each of the four grocery store corporations. The partnership thereafter continued in existence, collecting remaining accounts receivable, paying remaining liabilities, and generally winding up its affairs, until April 1959. Petitioner Sorem filed the final partnership return on behalf of Boogaart Supply Co. for its fiscal year ended April 4, 1959, on or about June 11, 1959.

On September 27, 1958, the corporation purchased all of the stock of the four grocery stores from Sorem and Boogaart at book value for a total price of $88,349.62, one-half of that sum or $44,174.81 being paid to each of the petitioners.[3] Immediately after the transfer, Boogaart Supply Co., Inc., had actually outstanding 5,536 shares of its own stock. Of this number, 2,476 were owned directly by R. W. Boogaart and 2,092 by J. Milton Sorem. Boogaart's two children owned together 390 shares and the same number were owned together by Sorem's two children. Five unrelated key employees owned directly 188 shares. In addition, 1,012 authorized but not issued shares were under fixed option in varying amounts to the same key employees. The stock option agreements contemplated that each option holder would exercise his option in January of each year so as to purchase about 30 previously unissued shares of the stock of Boogaart Supply Co., Inc., each year for a period of 5 years upon payment of $160 per share. Neither Sorem nor Boogaart held any of these options to purchase additional stock.

The direct and constructive ownership of the stock of the four grocery store corporations prior to the distribution made on September 27, 1958, and the direct and constructive ownership of such stock immediately after the distribution were as follows:

STOCK OWNERSHIP IN FOUR GROCERY STORE CORPORATIONS [1]

*September 26, 1958 (prior to distribution)*

| Petitioner | Direct ownership | | Total shares owned directly and constructively | |
|---|---|---|---|---|
| | Number of shares | Percentage | Number of shares [2] | Percentage |
| Sorem | 108 | 50 | 162 | 75 |
| Boogaart | 108 | 50 | 162 | 75 |
| Total outstanding shares | 216 | | | |

[1] The four corporations owned by Boogaart Supply Co. (partnership) were: Boogaart of Concordia, Inc., Boogaart of Clay Center, Inc., Boogaart of Marysville, Inc., and Boogaart of Washington, Inc.
[2] Ownership computed using partnership attribution, sec. 318(a) (2) (A).

[3] Payment to Sorem by the corporation was effectuated by means of the forgiveness of an open account indebtedness in the amount of $6,070.10 and the issuance of a note for $38,104.71, which was fully satisfied in 1959. The record indicates that Sorem used a part of this money to repay to the corporation the $30,000 which he had borrowed in 1957. Boogaart was compensated by the cancellation of an indebtedness of $5,898.95, the payment of $3,275.86 in cash forthwith and the balance in installments of $15,000,

*September 27, 1958 (after distribution)*

| Petitioner | Direct ownership | | Total shares owned directly and constructively | | |
|---|---|---|---|---|---|
| | Number of shares | Percentage | Number of shares ³ | Percentage (6,548 shares) ⁴ | Percentage (5,536 shares) ⁵ |
| Sorem_____ | 0 | 0 | 129.2 | 59.8 | 70.72 |
| Boogaart_____ | 0 | 0 | 135.4 | 62.7 | 74.19 |

³ Ownership computed using corporate attribution through Boogaart Supply Co., Inc., sec. 318(a) (2) (C).
⁴ The total amount of Boogaart Supply Co., Inc., stock outstanding here includes 1,012 unissued shares subject to options, as per sec. 318(a)(3).
⁵ The total amount of stock outstanding is here limited to the 5,536 actually outstanding shares of Boogaart Supply Co., Inc.

The direct and constructive ownership of the stock of Boogaart Supply Co., Inc., prior to the distribution made on September 27, 1958, and the direct and constructive ownership of such stock immediately after the distribution were as follows:

STOCK OWNERSHIP IN BOOGAART SUPPLY CO., INC.

*September 26, 1958 (prior to distribution)*

| Petitioner | Direct ownership | | Total shares owned directly and constructively | | |
|---|---|---|---|---|---|
| | Number of shares | Percentage | Number of shares | Percentage (6,548 shares) ¹ | Percentage (5,536 shares) ² |
| Sorem_____ | 2,092 | 37.79 | ³ 3,915 | 59.8 | 70.72 |
| Boogaart_____ | 2,476 | 44.72 | ⁴ 4,107 | 62.7 | 74.19 |
| Shares owned by children of Sorem and Boogaart_____ | 4,568 | -------- | -------- | --------- | --------- |
| | 780 | -------- | -------- | --------- | --------- |
| Shares owned by employees of Boogaart Supply Co., Inc_____ | 188 | -------- | -------- | --------- | --------- |
| Total outstanding shares_____ | 5,536 | -------- | -------- | --------- | --------- |

*September 27, 1958 (after distribution)*

| | | | | | |
|---|---|---|---|---|---|
| Sorem_____ | 2,092 | 37.79 | 3,915 | 59.8 | 70.72 |
| Boogaart_____ | 2,476 | 44.72 | 4,107 | 62.7 | 74.19 |

¹ The percentages of total stock outstanding are here computed using 6,548 shares, which includes 1,012 unissued shares subject to options held by five employees of Boogaart Supply Co., Inc., in addition to 5,536 shares actually outstanding.
² The percentages of stock outstanding are here computed using only the 5,536 actually outstanding shares.
³ Includes 2,092 shares owned directly, 390 shares owned constructively through children (see sec. 318(a)(1)(A)), and 1,433 shares owned constructively through the Boogaart Supply Co. partnership (see sec. 318(a)(2)(A)).
⁴ Includes 2,476 shares owned directly, 390 shares owned constructively through children (see sec. 318(a)(1)(A)), and 1,241 shares owned constructively through the Boogaart Supply Co. partnership (see sec. 318(a)(2)(A)).

On September 27, 1958, the accumulated earnings and profits of each of the four grocery store corporations whose stock was purchased on that date by Boogaart Supply Co., Inc., from petitioners J. Milton Sorem and R. W. Boogaart were as follows:

| | |
|---|---|
| Boogaart of Concordia, Inc_____ | $19, 650. 69 |
| Boogaart of Clay Center, Inc_____ | 18, 570. 82 |
| Boogaart of Marysville, Inc_____ | 26, 632. 39 |
| Boogaart of Washington, Inc_____ | 1, 895. 72 |
| Total_____ | 66, 749. 62 |

None of the above-listed corporations have ever paid any dividends since the date of incorporation.

On September 29, 1958, Boogaart Supply Co., Inc., had accumulated surplus of $236,373.18. It has paid no dividends since the time of its incorporation.

Prior to its acquisition of the four grocery stores on September 27, 1958, the corporation had no open credit with any bank. After the acquisition the corporation was able to secure an open line of credit with the Harris Trust and Savings Bank at Chicago in the amount of half a million dollars. This line of credit has been utilized by the corporation in the construction of new supermarkets, providing, as it does, short-term cash to meet immediate construction costs while long-term financing, less easy to secure, is being worked out.

In their income tax returns for 1958, petitioners Sorem and Boogaart reported the distribution received by each of them as consideration for the sale of stock, taxable as long-term capital gain.

In his notice of deficiency, the respondent has determined that the distributions to petitioners Sorem and Boogaart on September 27, 1958, in exchange for all of the stock of the four grocery store corporations constitutes a dividend distribution taxable to them as ordinary income.

#### ULTIMATE FINDING

The distributions made by Boogaart Supply Co., Inc., to petitioners on September 27, 1958, constituted distributions essentially equivalent to a dividend.

#### OPINION

Respondent contends that the amounts received—in the form of cash and cancellation of indebtedness—by petitioners, as a result of the transfer of their stock in the four grocery stores, constitute the essential equivalent of a dividend distributed by the Boogaart Supply Co., Inc., and are therefore taxable at ordinary income rates. Petitioners urge that the transaction be viewed as a redemption by the corporation of their grocery store stock and that the amounts received in exchange for such stock be entitled to capital gains treatment.

It is admitted by petitioners that the facts as presented place the

transaction in question squarely within the provisions of section 304 [4] of the Code. Under that section, and by virtue of section 302(d), [5] the amounts received by petitioners from the corporation are treated

[4] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

(a) TREATMENT OF CERTAIN STOCK PURCHASES.—

(1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 * * *, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then * * * such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. * * *

* * * * * * *

(b) SPECIAL RULES FOR APPLICATION OF SUBSECTION (a).—

(1) RULE FOR DETERMINATIONS UNDER SECTION 302(b).—In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purpose of this paragraph, section 318(a)(2)(C) shall be applied without regard to the 50 percent limitation contained therein.

[5] SEC. 302. DISTRIBUTION IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) In General.—Subsection (a) shall if the distribution is substantially disproportionate with respect to the shareholder.

(B) Limitation.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) Definitions.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determination shall be made by reference to fair market value.

* * * * * * *

(3) TERMINATION OF SHAREHOLDER'S INTEREST.— * * *

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.— * * *

(5) APPLICATION OF PARAGRAPHS.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. * * *

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

(1) IN GENERAL.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.

(2) * * * [Not relevant to this case.]

* * * * * * *

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

as distributions of property to which section 301,[6] requiring ordinary income treatment, applies, unless as to one or both of petitioners such amounts can be categorized under section 302(a) as received "in exchange for the stock." See sec. 1.304–2, Income Tax Regs. Section 302(a) categorization may be obtained by meeting one or more of the tests provided by section 302(b).

Petitioners concede that the specific requirements for qualifying the transaction under section 302(b) (3) or (4) are not met by either of them. They also concede that, as to petitioner Boogaart, the redemption was not one which was substantially disproportionate within the meaning of section 302(b)(2). However, it is argued that, as to petitioner Sorem, the tests under section 302(b)(2), both as to reduction of stock ownership in the "issuing corporations" (the four grocery stores) to less than 50 percent of the total combined voting stock,[7] and as to reduction of his *proportionate* interest in those corporations by more than 20 percent,[8] are met.

The percentage and proportionate reduction tests of section 302(b) (2) (B) and (C) are required [9] to be applied with reference to the stock of the "issuing corporations," *taking into account the constructive ownership rules of section 318*.[10] Immediately prior to the redemp-

---

[6] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\* \* \* \* \* \* \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[7] Sec. 302(b)(2)(B), fn. 5, *supra*.
[8] Sec. 302(b)(2)(C), fn. 5, *supra*.
[9] By sec. 304(b)(1), fn. 4, *supra*.
[10] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) MEMBERS OF FAMILY.—

(A) IN GENERAL.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

(i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and

(ii) his children, grandchildren, and parents.

\* \* \* \* \* \* \*

(2) PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.—

(A) PARTNERSHIPS AND ESTATES.—Stock owned, directly or indirectly, by or for a partnership or estate shall be considered as being owned proportionately by its partners or beneficiaries. Stock owned, directly or indirectly, by or for a partner or a beneficiary of an estate shall be considered as being owned by the partnership or estate.

\* \* \* \* \* \* \*

(C) CORPORATIONS.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, then—

(i) such person shall be considered as owning the stock owned, directly or indirectly, by or for that corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation; and

214

tion, petitioners Boogaart and Sorem each owned directly 50 percent of the stock of the "issuing corporations." Immediately after the redemption, Boogaart Supply Co., Inc., the "acquiring corporation," owned 100 percent of that stock, and *directly*, neither of the petitioners owned any stock in the four grocery store corporations. However, by virtue of section 318(a)(2)(C),[11] petitioners, as shareholders of Boogaart Supply Co., Inc., are to be regarded as owning stock in its four subsidiaries in proportion to their percentage of actual and constructive stock ownership in Boogart Supply Co., Inc. Since it received 100 percent of the stock of the four grocery store corporations as a result of the transfer, petitioners' after-redemption interest in those corporations may be determined simply by reference to their after-redemption interest in Boogaart Supply Co., Inc.

On September 27, 1958, immediately after the redemption, Boogaart Supply Co., Inc., had outstanding actually and constructively 6,548 share of its stock.[12] Petitioner Sorem owned *directly* 2,092 of those shares. He concedes that an additional 390 shares are considered as owned by him constructively under section 318(a)(1)(A)(ii) and (a)(4)(A). He denies, however, that *any* shares of stock owned directly or constructively by petitioner Boogaart are attributable to him. We disagree.

After the redemption petitioner Boogaart held directly and constructively a total of 2,866[13] shares, all of which are considered as being *actually* owned by him. Sec. 318(a)(4)(A). Boogaart and Sorem were 50-percent partners in the Boogaart Supply Co. partnership which we have found as a matter of fact continued to exist until April 4, 1959.[14] Section 318(a)(2)(A) provides that

---

(ii) such corporation shall be considered as owning the stock owned, directly or indirectly, by or for that person.

(3) OPTIONS.—If any person has an option to acquire stock, such stock shall be considered as owned by such person. * * *

(4) CONSTRUCTIVE OWNERSHIP AS ACTUAL OWNERSHIP.—

(A) IN GENERAL.—Except as provided in subparagraph (B), stock constructively owned by a person by reason of the application of paragraph (1), (2), or (3) shall, for purposes of applying paragraph (1), (2), or (3), be treated as actually owned by such person.

(B) MEMBERS OF FAMILY.—Stock constructively owned by an individual by reason of the application of paragraph (1) shall not be treated as owned by him for purposes of again applying paragraph (1) in order to make another the constructive owner of such stock.

[11] Applied here without regard to the 50-percent limitation, see sec. 304(b)(1), fn. 4, *supra.*

[12] Of this number, only 5,536 shares were *actually* outstanding. However, an additional 1,012 shares are deemed to be outstanding by virtue of their being optioned to key employees, and thus considered as being owned by them under sec. 318(a)(3).

[13] Directly, he owned 2,476 shares, to which must be added the constructive ownership of an additional 390 shares actually owned by his children. Sec. 318(a)(1)(A)(ii).

[14] Petitioners admit that the partnership continued to exist until April 4, 1959, for the purpose of collecting and paying accounts, but maintain that, *in retrospect*, it "transacted no active business" after September 26, 1958. For this reason petitioners urge us to disregard the partnership for sec. 318 purposes, grounding their argument on the

stock owned directly or indirectly by a partner shall be considered as being owned by the partnership. Boogaart's 2,866 shares are therefore considered as being owned by the Boogaart Supply Co. partnership. Concomitantly, stock owned by a partnership is considered under section 318(a)(2)(A) as being owned proportionately by its partners. Sorem, as a 50-percent partner, consequently is considered as owning one-half the shares owned by the partnership, or 1,433 shares. This amount, plus his own actual and constructive ownership of 2,482 shares gives him a total of 3,915 out of 6,548 shares actually and constructively outstanding. Proportionately, Sorem is therefore considered as owning, *after the redemption*, 59.8 percent of the stock of the "issuing corporations." *Prior* to the distribution Sorem owned directly 50 percent of the outstanding stock of the four grocery store corporations, and indirectly he owned one-half of the 50-percent stock interest held by Boogaart pursuant to section 318(a)(2)(A), totaling 75 percent of the outstanding stock of the four "issuing corporations," directly and constructively. Since section 302(b)(2)(B), in conjunction with section 304(b)(1), limits "substantially disproportionate" redemptions to those redemptions immediately after which the redeemed shareholder owns less than 50 percent of the total combined voting stock of the "issuing corporations," it follows that petitioner Sorem, owning 59.8 percent of such stock, cannot qualify for "substantially disproportionate" treatment.

Inasmuch as the redemption was not "substantially disproportionate" within the meaning of section 302(b)(2) as to either of the petitioners, we now turn to a consideration of whether, as to one or both of them, the redemption was one which was "not essentially equivalent to a dividend" within the purview of section 302(b)(1).

Although with the enactment of the Internal Revenue Code of 1954 the statutory framework treating corporate distributions was completely recast,[15] section 302(b)(1) retains the flexible test used under prior law concerning distributions "not essentially equivalent to a dividend." Therefore the evidentiary criteria useful in determining under subsection (b)(1) the dividend or nondividend character of a

theory that the partnership attribution rules may only be *realistically* applied to a partnership which not only has legal existence but also is actively carrying on a business. We are not persuaded by this line of reasoning. The partnership *existed* immediately after the redemption; for what purpose is immaterial. As we view the statute, attribution is required by virtue of the mere *existence* of a partnership relation between corporate shareholders, and business activity has nothing to do with it. Certainly sec. 318 itself makes no reference to "business activity" as a prerequisite for partnership attribution, and in the absence of convincing authority we are unwilling to add this judicial gloss to an already complex section of the Code.

[15] "The distribution and reorganization provisions of the 1939 Code were sorted out and then rearranged into separate parts of subchapter C of Chapter 1 of subtitle A of the 1954 Code. Part I of subchapter C (26 U.S.C.A. §§ 301–318) contains rules for testing distributions by corporations other than liquidating distributions. Part II of subchapter C (26 U.S.C.A. §§ 331–346) covers liquidating distributions. * * * In making the breakdown

particular distribution which fails to qualify as a sale or exchange of stock under one of the three "automatic" tests contained in section 302(b) (2), (3), or (4), remain substantially the same as those which were found helpful by the courts in determining dividend equivalence under prior law. *Thomas Kerr*, 38 T.C. 723. In making the factual inquiry concerning the presence or absence of dividend equivalence under section 302(b) (1), we are precluded by section 302(b) (5) from taking into account the failure of the distribution in question to qualify as a sale or exchange of stock under any of the three specific tests set forth in section 302(b) (2), (3), or (4).

It is the petitioners' contention that the record establishes the existence of a corporate purpose sufficient to justify characterizing the distribution in question as consideration paid them for the purchase of their stock in the four grocery store corporations. Both the four retail grocery stores owned by petitioners and their wholesale grocery supplier were in a state of business expansion during 1958 but were handicapped by a lack of working capital. During the summer of 1958 petitioners' investment counsel advised them that any further underwriting of corporate stock or bond issues would need to be accompanied by the acquisition by Boogaart Supply Co., Inc., of the four grocery stores in order to improve its financial picture. Petitioners claim that the acquisition by Boogaart Supply Co., Inc., of the stock of the four grocry store corporations during 1958 and the distribution of cash or its equivalent to each of them was necessary in order to improve its capital structure on its balance sheet and to strengthen its credit position.

It is true that after the consummation of the transaction here in question Boogaart Supply Co., Inc., was able to secure a half-million-dollar line of credit with a Chicago bank which it utilized in expanding its business. In order to better its credit position and apparently also to facilitate administrative control over the integrated Sorem-Boogaart interests, Boogaart Supply Co., Inc., acquired all the stock of the four grocery store corporations which were thenceforth operated as subsidiaries of the wholesale supplier. While the record thus discloses a business purpose underlying the realinement of the

between Parts I and II of subchapter C an attempt was made to separate into their significant elements two general categories of cases dealing with corporate distributions which had been previously lumped together and treated as partial liquidations under § 115(a) and § 115(g)(1) of the 1939 Code. Thus under the 1954 Code, the category of cases wherein a distinction was drawn between stock redemptions which were to be given capital gains treatment rather than dividend treatment because they met certain tests when viewed from the standpoint of the stockholder's actions or motives are treated in Part I (26 U.S.C.A. §§ 301–318). On the other hand, the category of cases wherein a distinction was drawn between stock redemptions which were to be given capital gains treatment rather than dividend treatment because they met certain tests when viewed from the standpoint of the corporation's action or motives are treated under Part II (26 U.S.C.A. §§ 331–346). * * *" *Ballenger* v. *United States,* 301 F. 2d 192, 194 (C.A. 4, 1962).

corporate structure of the related wholesale and retail grocery businesses, we are unable to conceive how the distribution by Boogaart Supply Co., Inc., of $88,349.62 in cash or its equivalent served in any way to improve its balance sheet or strengthen its credit position. We cannot accept the conclusion which is implicit in petitioners' contention that a corporate purpose to obtain fresh capital would be served by a pro rata distribution of surplus to each of its two majority shareholders. In the absence of any evidence indicating a corporate purpose consistent with a distribution of accumulated surplus, we are convinced that the principal if not the sole purpose for the distribution here involved was a shareholder purpose. The real purpose subserved by the distribution in question, insofar as petitioner Sorem is concerned, appears to have been the cancellation of his indebtedness to the corporation. Only if the payment of the distribution in question to petitioners on September 27, 1958, is viewed as a dividend can it be regarded as in futherance of a normal corporate function.

Inasmuch as the distribution made to each of the petitioners on September 27, 1958, does not appear to have been made in furtherance of any corporate purpose but, on the contrary, appears to have been made merely for a stockholder purpose, and in view of the failure of the four grocery store corporations to pay any dividends, and their accumulations of earnings and profits, together with the absence of any substantial lessening of control over the combined enterprises, we are of the opinion that these payments constitute distributions essentially equivalent to a dividend, and we so hold. Cf. *Thomas G. Lewis*, 35 T.C. 71; *Ferro* v. *Commissioner*, 242 F. 2d 838, affirming a Memorandum Opinion of this Court; *Genevra Heman*, 32 T.C. 479, affd. 283 F. 2d 227.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

Bruce and Drennen, *JJ.*, dissent.

---

Dawson, *J.*, dissenting: I respectfully disagree with the majority opinion. After having heard the evidence in this case, I am convinced that the redemption here in question—motivated as it was by bona fide business considerations on the part of Boogaart Supply Co., Inc., and resulting as it did in the improvement in the credit position of that corporation—was not the essential equivalent of a dividend within the meaning of section 302(b)(1).

While the majority recognize that with the passage of the 1954 Code the law with respect to stock redemptions was substantially recast, S. Rept. No. 1622, 83d Cong., 2d Sess., p. 49 (1954); *Ballenger* v. *United States*, 301 F. 2d 192 (C.A. 4, 1962), their statement, to the effect that the *evidentiary criteria* useful in determining dividend

equivalency under section 302(b)(1) remain substantially the same as those formulated by the courts for making a like determination under *prior* law, i.e., section 115(g) of the 1939 Code, appears to be incorrect.

Section 115(g) and its predecessor sections contained what has been termed a "delphic proscription" against redemptions which were the "essential equivalent" of a dividend. However, it was early recognized that the term "essentially equivalent to a dividend" had *little* inherent meaning. In the evolution of the law relating to redemptions the courts, therefore, developed certain criteria whose presence or absence was thought to be helpful in making the factual determination as to whether a particular redemption was or was not "essentially equivalent to a dividend." In commenting upon the state of the law as it existed under the 1939 Code, we said that while—

There is no sole decisive test * * * a number of judicial criteria or guideposts have been determinative in placing a transaction within section 115(g).

Among these criteria are: The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital. [citing authorities] [*Genevra Heman*, 32 T.C. 479, 486 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960).]

With respect to the *1954* Code, although it is true that *in general* section 302(b)(1) was intended to incorporate existing law as embodied in section 115(g) of the 1939 Code,[1] the words "in general" must be stressed for the new provisions were not made fully coextensive with the old. *Thomas G. Lewis*, 35 T.C. 71 (1960). Consequently, because of the distinction which is drawn by the 1954 Code between part I of subchapter C and part II thereof,[2] certainly those factors mentioned in *Heman, supra*, dealing with *corporate contraction* are no longer germane to an inquiry under section 302(b)(1).

Corporate contraction, as a measure of nondividend equivalency, arose under earlier law by virtue of the fact that section 115(c) of the 1939 Code provided that any distribution in cancellation or redemption of stock was a distribution in liquidation, and distributions in liquidation were treated as in exchange for stock canceled or redeemed. An exception, however, was created by section 115(g) in cases where the stock was canceled or redeemed at such time and in such manner as to make the distribution essentially equivalent to a dividend. Thus

---

[1] See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 333–334 (1954).

[2] See majority opinion, fn. 15, *supra*.

all distributions, whether viewed from the corporate level (liquidations) or from the shareholder level (redemptions), were ultimately tested for dividend equivalency by section 115(g). Because they were required to utilize section 115(g) to test the dividend equivalency of distributions both in redemption *and* in liquidation, it was only natural that the courts should develop the corporate contraction rationale [3] in connection with section 115(g). The 1954 Code, however, was designed to treat *separately* distributions in liquidation (sec. 346) from those in redemption (sec. 302).[4] Since the corporate contraction rationale has meaning only in conjunction with distributions in liquidation, and since the dividend equivalency of liquidating distributions is tested by section 346, it follows that corporate contraction, as a measure of dividend equivalency, is now pertinent only to section 346, and has no meaning with regard to section 302.[5]

Similarly, the question of whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders has assumed a lesser degree of importance in making a determination of 302(b)(1) dividend equivalency by reason of the enactment of sections 302(b)(2) and 302(b)(5).[6] Additionally, Con-

---

[3] Based on the theory that if there was a contraction of the corporate business and if the distribution was in liquidation of assets no longer needed as a result of that contraction, the distribution was not essentially equivalent to a dividend since a dividend was a distribution of the profits of a continuing business operation.

[4] "distributions in redemption of stock which qualify as distributions in complete or partial liquidations under Part D of subchapter C [specifically secs. 331 and 346, I.R.C. 1954] are not within the scope of section 302." S. Rept. No. 1622, 83d Cong., 2d Sess., p. 233 (1954).

[5] Moreover, those cases which applied the corporate contraction rationale appear to have looked exclusively to the *source* of the funds or property with which the redemption was effected. Under the 1954 Code "those distributions characterized by what happens solely at the corporate level by reason of the assets distributed would be included as within the concept of a partial liquidation" and therefore treated under sec. 346. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 49 (1954).

[6] Indeed, the legislative history leaves some doubt as to whether the substantial disproportion of a redemption among the shareholders is a consideration pertinent to the 302(b)(1) inquiry at all. Sec. 302(b)(5) provides in part, that in determining whether a redemption of stock is "not essentially equivalent to a dividend" within the meaning of sec. 302(b)(1), the fact that it fails to be "substantially disproportionate," within the purview of sec. 302(b)(2), "shall not be taken into account." It is to be noted that the term "substantially disproportionate" had acquired a fixed and definite meaning as a term of art long before its incorporation into the 1954 Code, see *Genevra Heman*, 32 T.C. 479, 283 F. 2d 227 (C.A. 8, 1960). Although redemptions were ultimately to qualify for capital gains treatment in accordance with three definite standards in addition to the more vague "not essentially equivalent" standard under the Senate version, the *House* version of sec. 302 would have limited capital gains treatment *only* to those redemptions which were "substantially disproportionate." Thus the House report stated that "a distribution will be treated as a distribution in payment in exchange for stock only if the distribution is 'substantially disproportionate.'" H. Rept. No. 1337, 83d Cong., 2d Sess., p. a73 (1954). That the House understood it was dealing with a term of art—one which had acquired a specific meaning—is indicated by its use of quotes to set off the words "substantially disproportionate." However, since the House planned to make "substantial disproportion" the *only* test of dividend equivalency, it desired to give that term a stricter meaning than had hithertofore been given it by the courts. Thus, the House provided that "a distribution will be considered to be substantially disproportionate, with respect to a shareholder only if, immediately after the redemption, such shareholder owns less than 80 percent of the percentage of stock held by him prior to the distribution." H. Rept. No. 1337,

gress has manifested an intention that in the future application of of the section 302(b)(1) test, "the inquiry will be devoted solely to the question of whether or not the transaction may properly be characterized as a sale of stock by the redeeming shareholder to the corporation. For this purpose the presence or absence of earnings and profits is not material."[7] S. Rept. No. 1622, 83d Cong., 2d Sess., p. 234 (1954).

Thus, of the seven criteria noted in *Heman* as useful in determining dividend equivalency under section 115, only the following are pertinent to the present inquiry under section 302(b)(1): The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past. These are the criteria which are to be applied in making the general factual determination as to "whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation." This approach to the question of dividend equivalency is not the direct antithesis of the so-called "net effect" test,[8] but merely allows that a redemption of stock can have a business purpose justification sufficient to overcome its resemblance to a dividend under the "net effect" test.

Although the majority would seem to agree that "business purpose justification" for the redemption is the critical factor here,[9] as they

---

*supra.* While it cannot be doubted that the *quantitative* meaning of the term "substantially disproportionate" was thus henceforward to be different, there is nothing which indicates that its *qualitative* meaning as a term of art was to be changed in any way from that which it had under existing, i.e., 1939 Code, law. A reasonable conclusion to be drawn from this analysis is that "substantially disproportionate," which was utilized under the 1939 Code as one of the criteria in determining "nonessential dividend equivalency," and "substantially disproportionate" as used in section 302(b)(2) are differentiated in meaning only by *extent,* and in every other sense have the same meaning. The injunction of section 302(b)(5) would therefore remove from the 302(b)(1) inquiry all consideration as to whether the redemption under scrutiny was "substantially disproportionate" in *any* sense.

[7] "Not material," meaning that a redemption should not be considered "not essentially equivalent to a dividend" merely because of the absence of corporate earnings and profits. Dividend *treatment* of the distribution in such a case would result merely in a reduction in basis at which the stock is held. See secs. 302(d) and 301(c)(2).

[8] "The net effect of the distribution rather than the motives and plans of the taxpayer or his corporation is the fundamental question" in determining dividend equivalency. *Flanagan* v. *Commissioner,* 116 F. 2d 937 (C.A.D.C. 1940). "Under this test, the court must hypothesize a situation where the corporation did not redeem any stock, but instead declared a dividend for the same amount. The court then must examine the situation after the dividend and compare it with the actual facts of the case when stock was redeemed, viewed always from the shareholders' vantage point. The redemption is equivalent to a dividend if the results from the hypothetical dividend and the actual stock redemption are essentially the same." *Ballenger* v. *United States,* 302 F. 2d 192, 196 (C.A. 4, 1962). Under the strict "net effect" test, evidence as to business purpose is not permitted.

[9] See also *A. E. Levit,* 43 B.T.A. 1077, 1084 (1941), where, after stating that a number of tests had been evolved by the courts for determining the dividend equivalency of redemptions, we said that "one of the tests which is more favored is whether the redemption was apparently dictated by the reasonable needs of the business or whether, on the

view the facts "the distribution made to each of the petitioners on September 27, 1958, does not appear to have been made in furtherance of any corporate purpose but, on the contrary, appears to have been made merely for a stockholder purpose."

At the outset, it may be observed that, "In cases such as this, in which the stockholder-taxpayer[s] and the principal if not as a practical matter the only corporate officer[s] are one and the same * * *, it is difficult, to say the least, to distinguish between corporate purposes on the one hand and stockholder purposes on the other for [a] transaction of the kind involved." *Keefe* v. *Cote*, 213 F. 2d 651, 657 (C.A. 1, 1954). Yet, as the trier of fact, I am convinced that the *sole* purpose of the transaction in question was to benefit Boogaart Supply Co., Inc. In making what has always been a purely *factual* determination, see sec. 29.115–9, Regs. 111; sec. 1.302–2(b), Income Tax Regs.; *Jones* v. *Griffin*, 216 F. 2d 885, 887 (C.A. 10, 1954), I view the Boogaart interests, almost from their inception, as being in a constant state of expansion but plagued by insufficient working capital. Individual borrowings by the partners, the partnership, and the corporation had hithertofore failed to furnish sufficient capital. Public sale of corporate debentures in 1954 and 1955 had been of some assistance, but still plans for expansion outstripped available capital. During the course of financial discussions in the summer of 1958 investment counsel proposed that any further underwriting of corporate issues would have to be accompanied by the corporation's acquisition of the four grocery stores in order to better its financial picture. The *singular* purpose of the redemption under scrutiny was to provide a *means* for Boogaart Supply Co., Inc., to acquire the four retail grocery store corporations needed by it to bolster its credit position. That this *was* the purposes of the redemption, and that this purpose was achieved, is adequately evidenced by the fact that *prior* to the redemption all borrowings of the Boogaart-Sorem group had been on a first-mortgage secured-note basis upon which the partners were individually liable, while *after* the redemption Boogaart Supply Co., Inc., was able to secure a half-million-dollar *open* line of credit with a Chicago bank.

Historically speaking, the major purpose of section 302(b), section 115(g), and their predecessor sections was and is to preclude the tax avoidance possibilities inherent in allowing corporate distributions, taxable at capital gains rates, to be made in the presence of earnings and profits. Thus, in any factual determination of the dividend equivalence of a distribution in redemption, the presence or absence

other hand, it originated with or was designed for the benefit of the stockholders who received its fruits [citing cases]. It is true that most, if not all, of the cases applying that test have found other circumstances as well to support the result. *But essentially we think the test applicable by its own weight and that if applied it will be decisive of the present controversy."* (Emphasis supplied.)

of a tax avoidance motive becomes a critical inquiry. Motive of any sort, however, is subjective. While the existence of a bona fide business purpose motivation is anathema to tax avoidance, this, too, is subjective. Yet, subjective intent in the instant case can readily be established by objective manifestations—what the petitioners *said* they intended, corroborated by events which actually took place. Here, petitioners *say* the purpose of the redemption was to allow Boogaart Supply Co., Inc., to acquire the grocery stores to improve its credit position. By means of the redemption the corporation did so acquire the grocery stores, and as a result thereof its credit position *was* demonstrably improved.

Improvement in the credit position of a corporation has been held by this Court to be a business purpose sufficient to overcome the resemblance of a redemption to the distribution of a dividend. *Bona Allen, Jr.*, 41 B.T.A. 206 (1940). In that case corporate stock was redeemed pro rata to reduce stockholder indebtedness to the corporation in order that the corporation might have the high credit rating necessary for borrowing at extremely low rates of interest. There being no proof of a tax avoidance motive, the Court, finding that the sole motivation for the transaction was to improve the credit position of the corporation, held the redemption not essentially equivalent to a dividend. An argument was made by respondent questioning whether there actually was a business purpose for the *redemption*, since the same result could have been obtained by a cash distribution out of earned surplus sufficient to allow the shareholders to repay their indebtedness to the corporation. This contention the Court summarily rejected on the ground that the record indicated "the necessity for the retention of cash at all times by the corporation * * * obviously the corporation could not with safety to its business pay out all of its cash to the stockholders."

The same observation may be made with regard to Boogaart Supply Co., Inc. In a state of expansion, seeking outside financial backing, the distribution of a dividend by that corporation out of accumulated earnings would certainly have been financially foolish and totally inconsistent with the established corporate purpose of improving balance sheet viability. But a purchase of stock at book value, representing assets worth far in excess of such value—and what is *more*, representing improved ability to repay loans with profits from retail stores [10]— was totally consistent with the corporation's declared aim.

[10] In answer to the question, "Why did Boogaart Supply Company, Inc., want to acquire these [four grocery] stores?" J. Milton Sorem testified as follows:

"Well, we had been advised by our auditing firm and also an underwriter we were working with that we should make an effort to consolidate all of our corporations under the parent company, Boogaart Supply Company, Inc., because our financial statement was such that it looked to them that we would have to raise this money through equity capital instead of increasing our debt, namely, possibility of going public with our stock, so we were interested in getting all of the * * * subsidiaries wholly owned by the parent company, Boogaart Supply Company, Inc., to bolster up our financial statement. *The im-*

The majority state that "while the record * * * discloses a business purpose underlying the realignment of the corporate structure of the related wholesale and retail grocery businesses, we are unable to conceive how the distribution by Boogaart Supply Co., Inc., of $88,-349.62 in cash or its equivalent served in any way to improve its balance sheet or strengthen its credit position." However, Boogaart Supply Co., Inc., received, in exchange, not only stock having a book value equal to what was paid out, but which represented, as pointed out above, assets having a real value far in excess of the book value of the stock. While it is true that the corporate records would only reflect the book value of the stock, it was obvious that by reason of the acquisition, corporate earning power and ability to repay loans were increased many fold.

It has been suggested, however, that the same result, i.e., corporate acquisition of the four grocery stores, could as easily have been accomplished by a section 368 reorganization—with consequences to the parties determined by sections 351 and 1032—thus eliminating the need for *any* distribution by Boogaart Supply Co., Inc. It is further suggested that because of this there was no need to utilize redemption as a method of acquiring the four grocery stores, the inference being that there would be no business purpose for it. I disagree in no uncertain terms. The question here is not whether the same result could have been obtained without a corporate distribution, but whether the redemption, to which the distribution was a necessary concomitant, served a justifiable business purpose. *Jones* v. *Griffin*, *supra* at 890. In this case there is no doubt but that it did.

Therefore, in accordance with the congressional intent as to the nature of the section 302(b)(1) inquiry, it is my opinion that the instant transaction should be characterized as a sale of stock by Sorem and Boogaart to the corporation.

FISHER and SCOTT, *JJ.*, agree with this dissent.

---

*portant thing, that is, that we felt, anyway, was to get the earnings of these four retail stores over into the parent company, because in borrowing money the financial institutions, the banks, and so forth, looked to your ability to pay these obligations even more than some of the assets that you have, and it was real important in our opinion to get the earnings of four good retail stores over into the parent company so that those earnings could be listed or consolidated with the parent company's report." (Emphasis supplied.)*