*Decision will be entered under Rule 50.*

BAKER COMMODITIES, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1371–65, 5416–65, 5418–65, 5420–65. Filed June 23, 1967.

---

[1] Cases of the following petitioners are consolidated herewith: Frank Jerome and Helen Jerome, docket No. 5416–65; Varney Jerome and Iva Jerome, docket No. 5418–65; and Paul Jerome and Angelina Jerome, docket No. 5420–65.

*Carl A. Stutsman, Jr., Jack R. White,* and *Glenn M. Alperstein,* for the petitioners.

*Arthur P. Generaux, Jr.,* for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Petitioner | Docket No. | Taxable year ended— | Deficiency |
|---|---|---|---|
| Baker Commodities, Inc. | 1371-65 | June 30, 1961 | $57,324.26 |
| | | July 31, 1961 | 6,946.27 |
| | | June 30, 1962 | 341,322.69 |
| | | June 30, 1963 | 182,156.18 |
| Frank and Helen Jerome | 5416-65 | Dec. 31, 1961 | 25,760.93 |
| | | Dec. 31, 1962 | 305,694.99 |
| | | Dec. 31, 1963 | 17,774.89 |
| Varney and Iva Jerome | 5418-65 | Dec. 31, 1961 | 25,841.22 |
| | | Dec. 31, 1962 | 309,388.10 |
| | | Dec. 31, 1963 | 18,085.06 |
| Paul and Angelina Jerome | 5420-65 | Dec. 31, 1961 | 23,962.26 |
| | | Dec. 31, 1962 | 309,169.92 |
| | | Dec. 31, 1963 | 12,695.28 |

The cases have been consolidated and will be decided together. Numerous issues raised by the pleadings have been disposed of by the parties, leaving the following issues to be decided:

(1) Whether the promissory note in the amount of $3,150,000 given to the Jerome Bros. partnership by Baker Commodities, Inc., constituted a bona fide indebtedness, or was rather in the nature of preferred stock evidencing a risk capital investment by the partners.

(2) Whether Baker Commodities, Inc., obtained a stepped-up basis on the assets it acquired upon the complete liquidation in 1961 of two wholly owned subsidiaries.

(3) Whether the three Jerome brothers were entitled to report as long-term capital gain the gain they realized from their distributive share of the principal payments received from Baker Commodities, Inc., on the $3,150,000 promissory note.

(4) Whether Baker Commodities, Inc., obtained a stepped-up basis on the assets it acquired upon the complete liquidation in 1962 of a wholly owned subsidiary.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

All statutory references hereinafter are to the Internal Revenue Code of 1954 unless otherwise indicated.

Petitioner Baker Commodities, Inc., was duly organized and existed as a California corporation with its principal office in Los Angeles, Calif. For the tax years in question it filed its corporate income tax returns with the district director at Los Angeles, Calif.

The petitioners Frank and Helen Jerome are, and were at all times material herein, husband and wife residing in Downey, Calif. They filed their Federal income tax returns for all years in question with the district director at Los Angeles, Calif.

The petitioners Varney and Iva Jerome are, and were at all times material herein, husband and wife residing in Phoenix, Ariz. They filed their Federal income tax returns with the district director at Los Angeles, Calif., for the years 1961 and 1962 and with the district director at Phoenix, Ariz., for the year 1963.

The petitioners Paul and Angelina Jerome are, and were at all times material herein, husband and wife residing in Albuquerque, N. Mex. They filed their Federal income tax returns for all years in question with the district director at Albuquerque, N. Mex.

Since the wives of the individual petitioners are joined here only by virtue of their filing of joint returns with their respective husbands, use of the word "petitioners," when referring to the individual petitioners as distinguished from the corporate petitioner, will be used only in reference to the respective husbands.

Frank, Paul, and Varney Jerome are brothers who have been equal business partners since 1929 under the name of Jerome Bros. (hereinafter sometimes referred to as the Jerome Bros. partnership or the partnership). Their partnership agreement, although originally oral, was reduced to writing on or about January 1, 1951, and has continued in existence at all times up to and including the time of trial. In its early years, the partnership engaged in the fertilizer business. After discontinuing its fertilizer operations in 1937, it entered the business of rendering animal meat byproducts into animal feeding fats and inedible tallow. One of the most essential aspects of the tallow business is the procurement of raw materials such as meat scraps, fat, and bones. The raw material is obtained from various sources including retail markets, wholesale meat outlets, and packing houses. Since the partnership had no contracts with its sources of supply, procurement of needed raw materials was largely dependent upon personal contacts with its suppliers. While the company had many supplier accounts which were of longstanding duration, and although the company generally enjoyed a good reputation in the industry, it was still required to compete with four or five other companies in the acquisition of its raw materials. No part of the tallow business owned by the partnership was of a retail nature nor was the company's tallow marketed under any brand name. Approximately 60 percent of the tallow manufactured by the partnership competed in the world market where the price was determined by the market forces of supply and demand.

In 1940, the partnership expanded its tallow and rendering business to Phoenix, Ariz. The business in Phoenix was conducted in the partnership's name until 1946 when it was incorporated under the name of Phoenix Tallow Co. (hereinafter Phoenix Tallow). Thereafter, until June of 1961, the partnership owned all of the issued and outstanding stock of Phoenix Tallow. In 1947, the partnership began construction of a plant at Norwalk, Calif., a suburb of Los Angeles, and from 1947 until June 1961, the partnership engaged in the tallow and rendering business in and around the area of Los Angeles. In 1950, the partnership expanded its business to Kerman, Calif., where it acquired an interest in two California corporations, Kerman Tallow Works (hereinafter Kerman Tallow) and San Joaquin Packing Co. (hereinafter San Joaquin Packing). Until March of 1961, one-third of the stock of Kerman Tallow and San Joaquin Packing was owned by Harold Wardlaw (hereinafter Wardlaw), one-third by the partnership, and the remaining third by the R. S. Wilson Co. (hereinafter the Wilson Co.), a California corporation wholly owned by Robert S. Wilson. Wilson has been a business acquaintance of the three Jerome brothers since 1947 when, as a broker, he first solicited the partnership's rendering business in the Los Angeles area. In March

1961, Wardlaw's one-third interest in the two corporations was redeemed, leaving the outstanding stock divided equally between the Jerome Brothers partnership and the Wilson Co.

In addition to the foregoing businesses, the partnership owned all of the issued and outstanding stock of Baker Commodities, Inc. (hereinafter Old Baker), a California corporation. Thus, at the beginning of June 1961, the partnership owned 100 percent of the stock in Old Baker and Phoenix Tallow, and 50 percent of the stock in Kerman Tallow and San Joaquin Packing, all of which were principally engaged in the business of rendering animal meat byproducts into animal feeding fats and inedible tallow. The partnership also owned certain pieces of real property used in connection with the rendering and tallow business. In addition, the partnership conducted business under fictitious names. In the Albuquerque, N. Mex., area, the partnership operated under the name of Atlas Rendering Co.; in the area of Honolulu, Hawaii, Pacific Rendering Co.; and in the Los Angeles area, Star Processing Co.

Beginning in the early 1950's, the three Jerome brothers began considering the problem of perpetuating their tallow and rendering business. They were concerned with the ownership and management of that business after their deaths, and inasmuch as the brothers had no relatives other than each other who were in the top management of the business, they determined to transfer it to a group composed of themselves and seven other men (hereinafter keymen), six of whom were employees of the partnership.[2] The seventh, Jack Keith, owned a consulting engineering company which had, since 1947, done considerable engineering work for the partnership. In 1954, Keith formed a general partnership with the Jerome brothers, Keith owning 50 percent and the remaining 50 percent owned equally by the three Jerome brothers. The nature of Keith's business was thereafter changed from one of consulting and engineering to manufacturing and engineering, with the Keith partnership continuing to do work for the Jerome partnership. The Keith partnership was still in existence as of the time of trial.

In the late 1950's, the three Jerome brothers began to informally discuss with the seven keymen the possibility of transferring to them a part ownership in the partnership's tallow and rendering business. Between 1959 and June 1961, there were several conversations relative to this possibility, at some of which all 10 individuals were present

---

[2] The six employees selected by the Jerome brothers to participate in the transfer of the partnership business, together with their period of association with the business, were the following: Stephen Frank Shultz, employed since 1950; Louis J. Frederick, employed since 1952; Walter Sanderson, employed since 1953; James M. Andreoli, employed since 1951; Laverne A. Nelson, employed since 1951; and J. E. Rickert, employed since 1958. The foregoing employees will sometimes hereinafter be referred to by their last names.

and at others, less than 10 were present. These discussions continued until early 1961 when the Jerome brothers and the keymen began to discuss the specific terms and conditions by which the partnership's business might be sold to the 10 individuals. During the period of these discussions one of the keymen, Andreoli, ordered current appraisals of the fixed assets used in the partnership's tallow and rendering business in order to more accurately determine the value of those assets for the purposes of negotiation.

Tait Appraisal Co. appraised most of the partnership's assets outside of the Honolulu, Hawaii, area.[3] The assets located in Hawaii were appraised by the General Appraisal Co. Of the 12 Tait appraisals, 11 contained the following explanatory statements:

> This appraisal is made for the purpose of determining the sound, physical value of the herein described property. Economic factors that would affect the market value of this property have not been considered. This report, in no way, is to be construed as determining Market Value, Liquidation Value, Loan Value, or any other type of value that would necessitate the consideration of economic factors.

> \*     \*     \*     \*     \*     \*     \*

> All items of construction and equipment have been listed in detail, and priced on the basis of local replacement cost. In the case of standard manufactured articles, the manufacturer's price, plus freight and cartage has been used.

The 12th report based its appraisals on the fair market value of lands, buildings, other improvements, and equipment of San Joaquin Packing and Kerman Tallow.

Keith assisted in the preparation of the appraisals by making a survey of the existing plant facilities. As a result, he had a detailed knowledge of the production facilities at the various plants and, in addition to assisting in the negotiations for the partnership assets, he supplied the Tait Appraisal Co. some of the information used by it in preparing its appraisals. The appraisals were examined and relied upon by the keymen and the Jerome brothers in their negotiations concerning the price to be paid for the partnership business. Three of the keymen, Nelson, Andreoli, and Frederick, all of whom had accounting backgrounds and who were familiar with the appraised assets, analyzed the appraisals and discussed their conclusions relating to the valuation of the assets with the other keymen, as well as with the Jerome brothers, in placing a dollar value on the partnership business to be acquired by the 10 individuals. The 1961 negotiations resulted in all 10 individuals agreeing to a purchase price of $3,212,000 for the partnership assets in question. Nelson discussed with the other keymen the various considerations that went into determining that price and indicated that in his judgment $3,212,000 was a fair price. This price was based upon

---

[3] Land and equipment not appraised by Tait, either because it was not in existence at the time the appraisals were made or because it was somewhat specialized as to use or location, was appraised by company officers.

the fixed assets included in the Tait and General appraisals as well as other partnership assets such as cash, accounts receivable, and certain land and equipment which had been excluded from the appraisals. The purchase price also took into account the redemption price which Kerman Tallow and San Joaquin Packing had paid in March 1961 to redeem Wardlaw's interest in those corporations. In arriving at the purchase price, the Jerome brothers made no request for payment of goodwill and the keymen made no offer to pay for goodwill.

Inasmuch as the keymen were not financially able to raise sufficient moneys to pay for the partnership's tallow and rendering business, it was necessary that the purchase price be paid off out of earnings of the business over an extended period of time. In order to better determine the ability of the business to pay the purchase price out of current earnings, Frederick, one of the keymen who was responsible for marketing, projected a market program to determine the ability of the business to make such payments. Andreoli prepared a cash flow analysis based on projected earnings anticipated from the business over a 10-year period and arrived at the conclusion, which was reviewed and concurred in by Nelson and reinforced by Frederick's marketing projection, that while the purchase price could not be paid off within a 10-year period, as the Jerome brothers had desired, it could be paid off out of current earnings in a period of 15 years. Andreoli discussed this conclusion with the Jerome brothers and based upon Andreoli's analysis, the brothers agreed to a 15-year period.

The keymen and the Jerome brothers also discussed the matter of the amount of the initial payment on the purchase price. Originally the brothers wanted $300,000, which the keymen felt was too high, but after further negotiations, the brothers agreed to accept $150,000, which was made as the first principal payment under a promissory note. In respect to the interest rate on the unpaid balance of the purchase price, the parties agreed upon a level interest rate of $80,000 per year for 15 years, which amounted to 5 percent on an annual basis. The leveling out of the interest rate was made in order that the acquiring group could make lower interest payments in the earlier years with the corresponding advantage to the brothers derived by leveling out their interest income over the 15-year period.[4] Although the partnership's average annual net earnings in the 5 years ended June 30, 1961, was only $72,200,[5] and the annual payments required to be made by the acquiring group under the purchase agreement was $280,000 per

[4] Inasmuch as the acquiring group was required, under the promissory note in question, to make a total annual payment of $280,000 in each of the 15 years, any advantage in making level interest payments would appear to flow only to the Jerome brothers.

[5] Although petitioners' witnesses testified to average annual net income of between $80,000 and $90,000 during this period, petitioners' Exh. 41 revealed total net earnings during the period of only $361,000, or a yearly average of $72,200.

year, the decision to accept such terms was based upon the projected growth rate of the company's sales and earnings.

In May of 1961, after the parties had agreed to the price and terms of the contemplated transaction, the parties and their accountant consulted with tax counsel for the purpose of having the contemplated transaction effectuated in the most beneficial manner from a tax point of view.

On May 14, 1956, a California corporation was organized under the name of American Extraction Co. but it remained dormant until May 2, 1961, at which time it was reactivated and its name changed to Jerome Bros.[6] On June 20, 1961, an application was filed by the Jerome Bros. corporation for a permit to issue 10 percent of its stock to each of the seven keymen and each of the three Jerome brothers. On June 23, 1961, the commissioner of corporations of the State of California issued a permit to the Jerome Bros. corporation authorizing it to issue and sell its stock to the 10 individuals named in the application dated June 20, 1961. Shortly after the issuance of that permit, each of the 10 individuals made a capital contribution to the corporation in the amount of $500, for a total paid-in capital of $5,000, and thereby acquired five shares constituting 10 percent of the issued and outstanding stock of Jerome Bros. corporation. On July 25, 1961, the corporation's name was changed from Jerome Bros. to Baker Commodities, Inc. (hereinafter New Baker),[7] and each of the 10 individuals who received stock in the corporation on or about June 23, 1961, has at all times since that date been owner of record of 10 percent of the issued stock of that corporation.

On June 26, 1961, an "Agreement of Purchase and Sale" was entered into between the Jerome Bros. partnership, as seller, New Baker, as buyer, and the individual stockholders of the corporation, under which New Baker acquired from the partnership all the issued and outstanding stock of Old Baker and Phoenix Tallow and 50 percent of the issued and outstanding stock of Kerman Tallow and San Joaquin Packing, together with two parcels of real property owned by the partnership. The agreement provided for a purchase price of $3,150,-000 together with an assumption of indebtedness of the partnership in the amount of $62,000,[8] amounting to a total purchase price

---

[6] The Jerome Bros. corporation was a legal entity separate and distinct from the Jerome Bros. partnership previously mentioned.

[7] While the corporation which acquired the partnership's tallow and rendering business in June 1961 was technically "Jerome Brothers," future reference to the successor corporation will be to Baker Commodities, Inc., or New Baker. Since the successor corporation adopted the same name as one of the corporations formerly owned by the Jerome Bros. partnership, i.e., Baker Commodities, Inc., we have adopted the designations "New Baker" and "Old Baker" to distinguish the former from the latter.

[8] The unpaid balance due on a first deed of trust securing certain California property was in the amount of $50,000, and the unpaid balance due on a first mortgage securing certain Arizona property was in the amount of $12,000, together constituting a total assumption by the corporation of $62,000.

of $3,212,000. The purchase price was evidenced by the 15-year promissory note above referred to in the principal amount of $3,150,000, bearing interest at the level rate of $80,000 per year, with principal payable in equal annual installments of $200,000 over the 15-year period.

Under the terms of the agreement, each of the 10 stockholders was required, at the time of closing, to pledge 4.6 of his 5 shares, or 92 percent thereof, with a pledgeholder for the purpose of securing the payment of the promissory note. With respect to the stockholders' pledged shares, the agreement provided the following:

### LIMITATION ON STOCKHOLDERS' LIABILITY

Anything to the contrary herein contained notwithstanding, Stockholders shall have no personal liability to pay the aforementioned promissory note except from the proceeds resulting from the sale of the aforementioned pledged shares, and in no event shall the Stockholders be personally liable for any deficiency arising from the sale of such shares, nor shall any action or proceeding be brought by the Seller against the Stockholders to recover a personal judgment against the Stockholders, or any of them, upon the aforementioned promissory note.

In addition, the agreement imposed the following restrictions on the corporation so long as any part of the promissory note remained unpaid:

### COVENANTS OF BUYER

Buyer will not, without prior written consent of Seller:

A. Make any change in the compensation, direct or indirect, to any officers or Stockholders of Buyer;

B. Permit any form of distribution of its corporate assets including, but without limitation thereto, the payment of dividends in stock or in cash;

C. Make any sale, assignment, conveyance, mortgage, pledge, encumbrance or lien of any of its assets, or any part thereof, except in the usual and ordinary course of business;

D. Amend its Articles of Incorporation or issue any additional shares of stock of any class;

E. Create any new debt of Buyer in excess of $500,000.00 except in the usual and ordinary course of business in connection with purchase money obligations and obligations under conditional sales contracts or other title retention agreements with respect to new equipment acquired by the Buyer for use in the ordinary and usual conduct of its business;

F. Make loans, advances or guarantees to any person, firm or corporation except by way of assumption of liabilities of any subsidiary of the Buyer in connection with the liquidation and dissolution thereof and except that the buyer may make loans or advances not exceeding at any time the aggregate amount of $100,000.00 of which amount not more than $25,000.00 in the aggregate shall constitute loans or advances to officers or employees of the Buyer;

G. Purchase or acquire stock or securities or assets or the business of any other person, firm or corporation except: (1) by liquidation and dissolution of a subsidiary; or (2) all or a portion of the assets and business of any person, firm or corporation engaged in a business similar to that of the Buyer provided that the purchase price paid for any such transaction of purchase or acquisition shall not exceed $250,000.00;

H. Enter into any partnership arrangement;

I. Merge or consolidate with any other corporation.

The Buyer further covenants that Buyer will at all times carry multiple risk insurance and maintain public liability and property damage insurance satisfactory to the Seller and that it will maintain its corporate existence and all licenses and franchises necessary or desirable to the profitable conduct of Buyer's business.

A pledge agreement executed by the 10 individual stockholders of New Baker and incorporated by reference into the agreement of purchase and sale provided that although the pledged stock was to be transferred to a pledgeholder, the pledgors (stockholders) would retain their voting rights in New Baker. Under the pledge agreement the pledgors obligated themselves as follows:

### COVENANTS OF PLEDGORS

The Pledgors [seven keymen and three Jerome brothers, by definition] covenant that while this Agreement is in full force that they will cause the Buyer [New Baker] to perform all the terms, covenants and agreements of the Agreement of Purchase and Sale between Pledgee [Jerome Bros. partnership] and Buyer executed on the date hereof and will cause Buyer to make full and timely payment of the promissory note issued by Buyer to Pledgee in accordance with said Agreement of Purchase and Sale.

In the event of default by the pledgors, the pledge agreement provided as follows:

### DEFAULT

Pledgeholder shall, upon notice by Pledgee in writing that Pledgors are in default in the performance of any of the terms, covenants and agreements of this Agreement on their part to be kept and performed and such default continues for thirty (30) days, sell the pledged shares, or any part thereof, at public or private sale on fifteen (15) days notice, in writing, to Pledgors of the time and place of such sale. Pledgors shall apply the proceeds of such sale to the payment of the expenses incident thereto, including counsel fees, and to the payment of the principal and interest upon the promissory note. Surplus, if any, shall be paid to the Pledgors in proportion to their interest in the shares of Buyer. At any sale of the pledged shares deposited hereunder, Pledgee may purchase the whole, or any part, of the pledged shares sold and receive title thereto free from any claim or demand of Pledgors.

There has been no default under the purchase and sale agreement and as of the time of trial, it was in full force and effect.

The promissory note referred to in the agreement of purchase and sale was executed on June 26, 1961, and provided as follows:

### PROMISSORY NOTE

$3,150,000.00        Los Angeles, California        June 26, 1961

In installments as herein stated, for value received, we promise to pay to JEROME BROTHERS, a co-partnership, or order, at Los Angeles, California,

the sum of THREE MILLION ONE HUNDRED FIFTY THOUSAND DOLLARS ($3,150,000.00) with interest as herein stated.

Principal payment of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00) shall be paid on June 30, 1961, and principal payments shall be payable annually thereafter in equal annual installments in the amount of TWO HUNDRED THOUSAND DOLLARS ($200,000.00) commencing on June 30, 1962, and continuing thereafter annually until said principal has been paid in full.

Interest on this obligation shall be payable and accruable at a level rate of FORTY THOUSAND DOLLARS ($40,000.00) semiannually for thirty (30) consecutive semiannual payments, the first of which shall be payable on or before December 31, 1961, and the others each successive six (6) months thereafter, payable on or before June 30 and December 31 of each year until a total of thirty (30) such semiannual installments of interest shall have been paid. Should any principal installment not be paid on or before the due date thereof as hereinabove provided, an additional interest charge shall be payable by maker at the rate of five per cent (5%) per annum on the amount of such principal payment not paid when due until the same shall have been so paid and such additional interest shall be payable on demand. Should interest installments not be paid at the times specified herein each shall bear interest thereafter at the rate of five per cent (5%) per annum payable on demand.

Should default be made in payment of any installment of principal or interest when due, the whole sum of principal and interest shall become immediately due at the option of the holder of this note.

If the maker shall become insolvent or if it should make a general assignment for the benefit of creditors or if it should file a petition in voluntary bankruptcy or if an involuntary petition in bankruptcy be filed against it and not be dismissed within thirty (30) days from the filing thereof or if a receiver be appointed for the property or assets of maker and such receivership not be discharged within thirty (30) days from the appointment of said receiver, then and in any such event this note shall at the option of the holder become entirely due and payable immediately.

This note is subject to a certain "Agreement of Purchase and Sale" dated June 26, 1961, * * * and is further subject to a certain "Pledge Agreement" dated June 26, 1961, * * *

If action be instituted on this note, then the maker shall pay such sum as the Court may fix as attorneys' fees.

Also on June 26, 1961, New Baker and its stockholders entered into an agreement of purchase and sale with the Wilson Co. pursuant to which New Baker purchased from that company the remaining issued and outstanding shares of corporate stock of Kerman Tallow and San Joaquin Packing. The agreement provided for a total purchase price of $250,500, to be evidenced by a promissory note in that amount with interest at the rate of 6 percent per annum on the unpaid balance. Principal and interest were payable in 30 semiannual installments of $12,725.40 each. In all other respects this contract contained the same terms, provisions, and conditions as the agreement entered into on the same day between the Jerome Bros. partnership and New Baker, including a pledge agreement entered into by the 10 New Baker stock-

holders in favor of the Wilson Co.[9] Robert S. Wilson, sole owner of the Wilson Co., was aware that the price, terms, and conditions surrounding the sale to New Baker of his company's 50-percent interest in Kerman Tallow and San Joaquin Packing were identical to those surrounding the sale by the Jerome Bros. partnership to New Baker of the other 50-percent interest in Kerman Tallow and San Joaquin Packing.

By reason of the purchase of all the issued and outstanding stock of Old Baker, Phoenix Tallow, Kerman Tallow, and San Joaquin Packing, those corporations became wholly owned subsidiaries of New Baker. At all times after June 26, 1961, San Joaquin Packing and Phoenix Tallow continued to be operated by New Baker as wholly owned subsidiaries. However, within 5 days after June 26, 1961, New Baker adopted resolutions to liquidate Old Baker and Kerman Tallow. The minutes of the corporation's board of directors meeting of June 26, 1961, provided, in part, as follows:

The Chairman further stated that * * * it had been decided that it would be in the best interests of * * * [New Baker] that a plan of complete liquidation be adopted by * * * [New Baker] as the sole shareholder of * * * [Old Baker and Kerman Tallow] whereby * * * [Old Baker and Kerman Tallow] would be liquidated and all of their assets distributed to * * * [New Baker] in complete cancellation of all of the shares of * * * [Old Baker and Kerman Tallow] all in accordance with Section 332 of the 1954 Internal Revenue Code. A discussion ensued first as to the advisability of liquidating * * * [Old Baker] in accordance with the aforementioned plan.

Thereupon, on motion duly made, seconded and unanimously carried, it was

RESOLVED, that this corporation, as the sole shareholder of * * * [Old Baker] a California corporation, ("the subsidiary"), hereby adopts a plan of complete liquidation of the subsidiary whereby all of the assets of the subsidiary be distributed to this corporation in liquidation and in complete cancellation of all of the shares of the subsidiary and that this corporation does hereby consent to the winding up of the affairs of * * * [Old Baker] and to its voluntary dissolution;

The minutes of that meeting indicate that a similar discussion ensued as to the advisability of liquidating Kerman Tallow. As with Old Baker, the board resolved to completely liquidate and dissolve Kerman Tallow.

Shortly after the liquidation of Old Baker and Kerman Tallow, New Baker's internal auditing staff and its outside accounting staff allocated the purchase price of the stock in those companies to the various tangible assets acquired by New Baker as the basis thereof. These allocations were based principally upon the Tait and General appraisals. Within 3 months after the allocations were made, the cor-

---

[9] The pledge agreement in favor of the Wilson Co. provided that the stockholders as a group would deposit 4 shares of New Baker stock with the pledgeholder. Since 46 of the 50 issued and outstanding shares of New Baker stock were already pledged, the pledging of the remaining 4 shares, or four-tenths of a share by each of the 10 shareholders, left no New Baker stock unpledged as of June 26, 1961.

poration sold several items of equipment at a price which was $108,228.57 less than their recently allocated basis.

Each of the stockholders of New Baker, with the exception of Keith, has at all times from June 26, 1961, to the time of trial been an employee of New Baker. At the time of trial Shultz was a vice president and general manager of New Baker; Frederick was employed as its vice president in charge of sales; Andreoli was employed as its treasurer, controller, and office manager; Sanderson was plant superintendent; Nelson was secretary; Rickert was vice president in charge of customer relations; Varney Jerome was employed as general manager of Phoenix Tallow and was an employee of New Baker; Paul Jerome was employed by New Baker as general manager of its Albuquerque operations; and Frank Jerome was employed by New Baker as its president.

The following is a comparison of the net sales and earnings of the Jerome Bros. partnership from 1957 to 1961 and of its successor, New Baker, from 1962 to 1965:

| FYE June 30— | Net sales | ¹ Net earning |
|---|---|---|
| 1957 | $8, 041, 000 | $71, 800 |
| 1958 | 9, 345, 000 | 19, 500 |
| 1959 | 11, 842, 000 | 124, 300 |
| 1960 | 10, 981, 000 | 85, 500 |
| 1961 | 12, 080, 000 | 59, 900 |
| 1962 | 17, 970, 000 | 68, 800 |
| 1963 | 27, 105, 000 | 129, 400 |
| 1964 | 36, 465, 900 | 481, 600 |
| 1965 | 48, 899, 000 | 44, 500 |

¹ After deductions for depreciation, interest on notes, and income taxes. New Baker's income tax returns for its fiscal years ended June 30, 1962 and 1963, reflected depreciation deductions of $586,609.68 and $408,286 respectively.

The average annual net earnings for the 5-year period ended June 30, 1961, was $72,200, and the average annual net earnings for the 4 years ended June 30, 1965, was $181,075.

Prior to the time the keymen acquired ownership interests in New Baker, Frank Jerome had been advised by his attorney that if the keymen were each given a 10-percent interest in New Baker, the three Jerome brothers would lose control of the business inasmuch as they would own only 30 percent of the company's voting stock. After New Baker acquired the tallow and rendering business owned by the Jerome Bros. partnership, a shift occurred in management responsibilities and authority to the extent that the keymen, principally Andreoli, assumed more responsibility and more administrative control over the operations of New Baker. Prior to May of 1961, contact between the Jerome Bros. partnership and its attorneys was conducted almost exclusively by Frank Jerome insofar as the decision-making process

was concerned. Beginning in May of 1961, however, New Baker's attorneys had occasion to work with each of the stockholders on legal problems (other than Rickert who was located permanently in Kerman, Calif.), and subsequent to June of 1961, New Baker's attorneys' contacts with the corporation in the area of decision-making have been mainly with the keymen. In the area of banking, the bank which served the needs of the partnership and later New Baker has dealt more frequently with the keymen than with Frank Jerome since June of 1961.

At the time New Baker acquired the tallow business from the Jerome Bros. partnership, there existed obligations owing from the partnership to the Bank of America (hereinafter the bank). Inasmuch as New Baker was to assume these partnership obligations, the bank, in order to protect itself, required the three Jerome brothers to subordinate the New Baker promissory note to the bank loan and, in addition, to personally guarantee New Baker's indebtedness to the bank. Inasmuch as the bank viewed the three Jerome brothers as the principal creditors of New Baker, the bank would not have advanced credit to New Baker without the subordination agreement and their personal guarantee.[10]

At no time after New Baker acquired the partnership assets was there an agreement, oral or written, or any understanding of a tacit nature between the Jerome brothers and the seven keymen restricting the latter's rights to vote their New Baker stock or in any way transferring to Frank, Paul, or Varney Jerome voting control of New Baker. Neither has there existed any voting trust agreement relative to the stock of New Baker. Since June of 1961, all 10 stockholders of New Baker have served on its board of directors and have attended and voted at the board meetings. While the three Jerome brothers attended these meetings from time to time, Frank was absent most of the time.

In 1958 Keith started experimental engineering work to design a continuous-operation plant for the purpose of converting Old Baker's batch-cooking process to a continuous-cooking process. The continuous process had the advantage over the batch process of greater output, less labor, higher quality of end product, and less loss where volume production was involved. When New Baker acquired the partnership tallow business in June 1961, the continuous-cooking process was still in an experimental stage and was not sufficiently perfected for commercial purposes until about mid-1962, at which time some of New Baker's Los Angeles operations converted from a batch-cooking proc-

---

[10] In the opinion of the vice president and manager of the bank handling the loan account of both the Jerome Bros. partnership and later New Baker, at the time of its incorporation New Baker was "thinly capitalized" and had a "very nominal" net worth.

ess to a continuous process.[11] Although some of the equipment used in New Baker's batch plants was sold, the bulk of that equipment was transferred to other New Baker plants which did not produce sufficient volume to justify a continuous-process plant but were in need of better batch-cooking equipment than they possessed.

The operations of the Phoenix plant relocated and converted to a continuous-process plant about October 1964. This relocation was made pursuant to plans adopted 9 months to a year prior to that time.[12] The Phoenix batch plant continued to be used until approximately May of 1965 inasmuch as the new continuous plant was not able to be fully used until that time.

Respondent's sole witness, a cost estimator, was of the opinion that the assets purchased by New Baker from the Jerome Bros. partnership in 1961 had a total fair market value of $3,069,782.27,[13] of which he attributed $600,000 to going-concern value, including goodwill, leaving an estimated fair market value of $2,469,782.27 attributable to fixed assets. In arriving at his cost estimate, the witness did not personally inspect the buildings and equipment which were located in Albuqurque, New Mex., Honolulu, Hawaii, Ohama, Nebr., and Kerman, Calif. Neither was he personally familiar with New Baker's land holdings in Kerman, Calif., New Mexico, Hawaii, and Nebraska. In appraising the properties which he had not personally inspected, the witness relied primarily on the description of those properties as supplied by the Tait and General appraisals. In making his cost estimate, he assumed that all equipment, including that which he had not actually inspected, was in good working order. The only properties which the witness personally inspected were those located in Los Angeles and Phoenix. While inspecting the Los Angeles plant, the witness examined only a minor portion of the equipment included in the Tait appraisals. As to the equipment which he did inspect at the Los Angeles plant, he made no attempt to tie it into the Tait appraisals, except for one blood plant cooker. In Phoenix, the witness saw a majority of the equipment which had been included in the Tait appraisals. At the time respondent's witness appraised New Baker's business in early 1966, he had no familiarity with the tallow business in general and had never appraised a tallow company. The witness viewed New Baker as a brokerage-type business and concluded that since a brokerage business is a service business and since most service businesses contain an element of goodwill, New Baker likewise had goodwill. In coming

---

[11] Keith and Andreoli testified that as of the June 1961 partnership acquisition they were not aware of any plan to dismantle the Los Angeles batch plant. Dismantling of the plant, which began in mid-1962 was completed by approximately February of 1966.

[12] As of June 1961, Keith had no knowledge of any plans to relocate the Phoenix plant.

[13] This figure was less than $150,000 (or approximately 4½ percent) lower than the negotiated price of $3,212,000 which had been paid for the partnership assets by New Baker.

to this conclusion, the witness made no effort to determine whether or not New Baker had competitors, what markets it served, or what percentage of the company's products was sold outside the United States.

Manchester Medical Hospital, a limited partnership (sometimes hereinafter called Manchester), was created on or about January 1, 1958, for the sole purpose of constructing, owning, and operating a convalescent hospital. Immediately prior to March 1, 1961, the general and limited partners of Manchester, and their respective percentage interests were as follows:

| General partners | | Limited partners | |
|---|---|---|---|
| James F. Peacock | 33.33 | Frederick | 4.17 |
| Frank Jerome | 11.11 | Sanderson | 4.17 |
| Paul Jerome | 11.11 | Andreoli | 4.17 |
| Varney Jerome | 11.11 | Shultz | 4.17 |
| | | Nelson | 4.17 |
| | | Norman Macbeth | 4.17 |
| | | H. E. Akin and W. R. Poulton | 4.17 |
| | | William Ross | 0.166 |
| | | Richard Gunter | 0.166 |
| | | Dean Scofield | 0.83 |

Manchester was at all times a completely separate and independent entity whose business of operating a convalescent hospital was in no way connected with that of any other business involved in this proceeding. Pursuant to the purpose for which Manchester was formed, a convalescent hospital was in fact built and operated by it. The partnership ran into severe financial difficulties and the hospital was closed about July 1960. On March 1, 1961, the partnership, by installment sale, conveyed all of its assets to Southwest Community Hospital Association (hereinafter Southwest), a nonprofit corporation which was unrelated to any of Manchester's partners or any of the parties or entities involved in this case. Southwest gave a promissory note for the purchase price, secured by a chattel mortgage and deed of trust on the hospital property, each of which documents was dated March 1, 1961. The sale was also evidenced by a written agreement of sale, grant deed, and bill of sale, each of which was also dated March 1, 1961. Southwest commenced operating the hospital for its own account on or about March 1, 1961, and after that date Manchester no longer engaged in active business. In order to report income received from the 1961 installment sale, a partnership tax return was prepared and filed for Manchester for 1961 and 1962. Manchester filed its final tax return for the fiscal year ended August 31, 1962, reporting collections on installment sales in the amount of $36,623.97. While no other receipts or gross income was reflected on that return, it did reflect an unpaid balance of $12,500 on Southwest's note.

American Extraction Co., a limited partnership (hereinafter American)[14] was created on or about September 1, 1956, for the sole purpose of purchasing sewer skimmings from various governmental sewage disposal plants in order to extract and market grease contained in such sewer skimmings. As of 1960 and until its termination, the general and limited partners of American and their respective percentage interests were as follows:

| General partners | | Limited partners | |
|---|---|---|---|
| Frank Jerome | 22.33 | Keith | 3 |
| Paul Jerome | 22.33 | Shultz | 3 |
| Varney Jerome | 22.33 | Sanderson | 3 |
| | | Frederick | 3 |
| | | Nelson | 3 |
| | | Andreoli | 3 |
| | | John H. Haugh | 3 |
| | | Robert S. Wilson | 3 |
| | | Edwarde Ricci | 3 |
| | | James F. Peacock | 3 |
| | | Frank Jerome | 1 |
| | | Paul Jerome | 1 |
| | | Varney Jerome | 1 |

In September of 1956, pursuant to the purpose of such limited partnership, American entered into a written agreement with the County of Los Angeles and began purchasing sewer skimmings from it. In late 1958, American entered into an agreement with the County of Orange, Calif., and began purchasing sewer skimmings from that county in addition to those being purchased from Los Angeles County. A third agreement was negotiated in April 1959 with the City of Los Angeles and American began purchasing sewer skimmings from it about October 1, 1959. No other contracts were obtained by American. By the end of July 1960, all three agreements were terminated by American and it thereafter terminated all operations because the grease obtained from the sewer skimmings could not be sufficiently purified to make it marketable in profitable quantities.

At the time American terminated operations in 1960, it possessed approximately 3 million pounds of skimmings which were turned over to Old Baker for sale under an oral agreement whereby Old Baker was to pay for it if and when sold. The skimmings were stored in Old Baker's storage tank on pier D, berth 30, Long Beach, Calif. In April or May of 1961, Old Baker determined that there might be a possibility of a market for the skimmings and sometime after receiving the results of a laboratory test on the fatty acid content of the

---

[14] This partnership, while similar in name, is to be distinguished from the California corporation which has been previously identified and whose name was changed in 1961 to Jerome Bros.

skimmings, dated June 15, 1961, New Baker's [15] vice president in charge of sales, Frederick, authorized the company to purchase the skimmings from American at a price of 3 cents per pound. American received final payment from New Baker sometime subsequent to Frederick's authorization.

The last partnership income tax return for American was filed for the calendar year 1960. Those individuals who had been partners in American reported income received from the 1961 disposition of American's inventory on their individual income tax returns for that year. When in early 1962 it was discovered that no formal steps had been taken to dissolve American, Nelson, New Baker's accountant and auditor, notified New Baker's legal counsel of that fact and requested that they prepare a formal certificate of cancellation of the limited partnership as of June 30, 1961, the end of Old Baker's fiscal year. Such a certificate was prepared, and on January 10, 1962, it was recorded.

A Panamanian corporation known as Veronica Compania Naviera S.A. (hereinafter called Veronica) was organized by the three Jerome brothers on or about August 15, 1956. The purpose of the corporation was to engage in the chartering and operation of ocean-going vessels. As of December 1962, all of the issued and outstanding capital stock of that corporation was owned by Frank, Paul, and Varney Jerome in equal amounts. The company had been actively engaged in business at all times since its organization. In 1962, the officers of New Baker discussed with the Jerome brothers the possibility of acquiring their Veronica stock. After being advised by their attorney that the Revenue Act of 1962 would cause adverse tax consequences to United States citizens owning stock in foreign corporations, the brothers indicated a willingness to sell their Veronica stock.

In December 1962, a stockholders meeting was held at which a full discussion took place between the various stockholders of New Baker concerning the advisability of purchasing the Veronica stock. Specifically discussed was a written marketing agreement which existed between Veronica and the Legaspi Oil Co. (hereinafter Legaspi), a Philippine corporation, pursuant to which Veronica was entitled to the exclusive right to market Legaspi's products, principally coconut oil. The New Baker shareholders considered the marketing agreement thoroughly in order to project potential income which New Baker might derive from it and thereby determine the price that New Baker should pay for the Veronica stock. The marketing agreement had ap-

---

[15] After New Baker acquired the Jerome Bros. partnership on June 26, 1961, New Baker apparently acquired the same contractual rights to the skimmings as were possessed by Old Baker prior to that date.

proximately 7 years to run and based upon a projection made by Andreoli of the estimated income that could be derived from the agreement and as to what it would cost New Baker to broker the material, it was determined by the keymen that the contract could produce a good income over its remaining life. The marketing agreement provided for a 1-percent brokerage fee which was unique in that New Baker would be able to obtain a 1-percent fee for handling commodities for Legaspi although New Baker would not have to pay the 1-percent brokerage fee when it marketed the commodities itself. In effect, New Baker could either sell the commodities direct or sell the commodities to other brokers whose commission fee was then less than 1 percent.[16] Based upon this comparative advantage over other brokers in the industry, Andreoli was able to place a value of $350,000 on the marketing agreement in December 1962.[17]

The net assets of Veronica in December 1962 (other than the marketing agreement) consisted of contracts and notes receivable in the amount of $964,599.13. At the time New Baker was negotiating the purchase of Veronica's stock, since it did not know whether it would be able to collect all of the receivables on the books of Veronica, the parties agreed to an offset for uncollectible accounts in the amount of $214,599.13 resulting in a purchase price of $1,100,000.[18]

By an "Agreement for the Sale of Stock" dated December 20, 1962, New Baker acquired all of the issued and outstanding stock of Veronica from the Jerome brothers. Introductory paragraph C of the agreement provided, in part, as follows:

C. Amongst said assets is a written agreement dated August 1, 1958, between Veronica and THE LEGASPI OIL CO., INC. ("Legaspi"), a corporation organized and existing under the laws of the Republic of the Philippines, which agreement provides in part for exclusive marketing privileges in favor of

---

[16] The testimony of petitioner's vice president in charge of sales, Frederick, emphasized the economic advantage to New Baker under such an agreement. Based upon a "current cost" of 15 cents a pound for coconut oil, or $300 a ton, a 1-percent brokerage fee amounts to $3 a ton which New Baker would receive for acting as broker of Legaspi's production whereas the normal brokerage fee in the industry was only $1 a ton. Additionally, Legaspi's production increased from 6,000 to 9,000 tons a month from December 1962 to the time of trial, causing New Baker to realize a 50-percent increase in income from the marketing agreement.

[17] The estimated value of marketing Legaspi's products was placed at $1,113,000 per month, which was expected to produce approximately $11,130 in brokerage income. Since New Baker estimated that its monthly selling cost was $5,130, it was left with a gross profit of $6,000 per month, or $72,000 per year. It was decided to give the latter amount a present value of $50,000 per year or $350,000 for the estimated remaining 7-year life of the agreement.

[18] The value of Veronica's stock was computed as follows:

| | |
|---|---|
| Assets less liabilities | $964,599.13 |
| Estimated value of exclusive marketing agreement | 350,000.00 |
| Total | 1,314,599.13 |
| Less reserve for uncollectible accounts | 214,599.13 |
| Value of stock | 1,100,000.00 |

Veronica of all coconut oil and coconut products produced by Legaspi, which marketing portion of said agreement is hereinafter referred to as the "Exclusive Marketing Agreement". The Exclusive Marketing Agreement is of substantial potential future value to Buyer, fitting into Buyer's projected pattern of engaging directly or through agents in the business of buying and selling commodities on a worldwide basis. * * *

Paragraph E–IV of the agreement further provided that:

It is agreed between the parties that of the Purchase Price $350,000.00 is the present fair value of the Exclusive Marketing Agreement and $750,000.00 is the present fair discounted value ("Net Asset Value") of the other assets of Veronica less its liabilities. * * *

In accordance with the terms of the agreement, promissory notes were executed by New Baker to each of the Jerome brothers in the amount of $366,666.67, representing one-third of the purchase price of the Veronica stock. The notes provided that no interest was payable if payments were made when due, otherwise at 6 percent from such due date.

On December 21, 1962, the board of directors of Veronica adopted a plan of complete liquidation. The following day, New Baker, the sole shareholder of Veronica, ratified the liquidation plan adopted by Veronica's board of directors. Pursuant to such plan Veronica was liquidated under the laws of the Republic of Panama on December 31, 1962, and all its assets and liabilities, including the marketing agreement with Legaspi Oil Co., were transferred to New Baker. The agreed purchase price of the stock, $1,100,000, was allocated to the assets of Veronica in accordance with the agreement of December 20, 1962, resulting in allocation of $350,000 to the marketing agreement. For the fiscal year ended June 30, 1963, New Baker deducted $25,800 as amortization of the marketing agreement.

Upon acquisition of the marketing agreement the terms of such agreement were carried out, specifically the payment by Legaspi to New Baker of the 1-percent commission. In the first 3 years under the agreement (1963, 1964, and 1965) New Baker received a gross profit from brokerage commissions of $471,000, thereby exceeding the total estimated gross profit for those 3 years by a substantial amount.[19] As of the time of trial, Legaspi had recently installed additional equipment which would increase its production capacity by 50 percent and thereby further increase the profits New Baker would derive from the marketing agreement. As a result, New Baker has received an estimated net income of $30,000 to $50,000 a year over and above all expenses, including amortization expenses. All principal payments due

[19] Petitioners had estimated a gross profit of $72,000 per year or $216,000 for a 3-year period. Thus, the actual gross profit for 1963 through 1965 exceeded that estimate by $255,000 or 118 percent.

394

and owing from New Baker to the Jerome brothers on the Veronica notes have been timely paid by New Baker.

Pursuant to the terms of the promissory note given the Jerome Bros. partnership by New Baker in consideration of the property transferred to it in June 1961, New Baker made principal and interest payments to the partnership out of current earnings for the years and in the amounts following:

| Year | Principal | Interest |
|------|-----------|----------|
| 1961 | $150, 000 | $40, 000 |
| 1962 | 200, 000 | 80, 000 |
| 1963 | 200, 000 | 80, 000 |

In their individual income tax returns for the calendar years 1961 through 1963, Frank, Paul, and Varney Jerome each reported as long-term capital gain the gain attributable to their distributive share of the principal payments received by the partnership from New Baker. Each partner's allocable share of the interest payment was reported as ordinary income and New Baker, on its corporate tax returns filed for the fiscal years ended June 30, 1962 and 1963, correspondingly, claimed as an expense, the interest payments made to the partnership under the note.

In 1961, as a result of New Baker liquidating two of its wholly owned subsidiaries, Kerman Tallow and Old Baker, New Baker used a stepped-up basis on the assets thus received in computing subsequent deductions for depreciation, cost of goods sold, and losses on the sale of assets. In the following year, as a result of New Baker liquidating Veronica, another wholly owned subsidiary, New Baker similarly used a stepped-up basis in allocating the amount it had paid for the Veronica stock to the various assets received from Veronica, including the exclusive marketing agreement.

In the notices of deficiency received by New Baker dated December 14, 1964, respondent disallowed those interest deductions claimed by New Baker as paid on the promissory note given the Jerome Bros. partnership in 1961. In addition, respondent determined that New Baker was not entitled to a stepped-up basis on any of the assets received from the liquidation of Old Baker, Kerman Tallow, or Veronica, thereby disallowing New Baker's claimed loss deductions as well as part of the deductions claimed for depreciation and cost of goods sold.

In the notices of deficiency received by the individual petitioners dated June 17, 1965, respondent determined that all amounts of income received by the Jerome Bros. partnership from New Baker constituted qualifying dividends, taxable as ordinary income to the individual petitioners rather than as interest income and long-term capital gain income, as reported by them on their returns for 1961 through 1963.

OPINION

## Issue 1

Upon acquiring the stock and real estate from the Jerome Bros. partnership in 1961, New Baker gave the partnership a promissory note which required New Baker to make interest payments at the annual rate of $80,000. Pursuant to that requirement, New Baker made the payments and claimed the amount so paid as an interest deduction on its corporate tax return for each of the fiscal years ended June 30, 1962 and 1963. Respondent disallowed the interest deductions on the ground that the claimed amounts did not arise out of a bona fide indebtedness but rather constituted nondeductible corporate dividends. Respondent's disallowance was predicated upon the theory that the promissory note actually represented a risk capital investment by the partners in the nature of preferred stock, and therefore, the $80,000 annual payment made by New Baker to the "stockholders" constituted dividends. In determining whether the promissory note evidenced a true debtor-creditor relationship, as petitioners contend, or only a risk capital investment as respondent contends, we are required to examine all pertinent facts in the record, there being no single test for determining whether an obligation which appears on its face to be a true evidence of indebtedness is such in fact. *Charles E. Curry*, 43 T.C. 667 (1965).

If form alone were controlling, we think the note in question clearly evidenced a true indebtedness. It contains an unconditional promise to pay a sum certain, together with interest, at designated intervals. The noteholder has the right to declare the entire balance due if the maker defaults in the payment of any installment of principal or interest and if the noteholder is required to institute action in order to collect on the note, he is entitled to reimbursement from the maker for attorney fees. While form alone may be relevant and entitled to some weight, *Charles E. Curry, supra*, we are required to examine all the relevant factors in order to determine whether the substance of the transaction complies with its form, *Gregory* v. *Helvering*, 293 U.S. 465 (1935). In attempting to discover whether a true debtor-creditor relationship arose upon the receipt of the promissory note in question, it is necessary to recognize the basic difference between a "stockholder" and a "creditor." As we observed in *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 58 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958),

*The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * *

After recognizing in *Kolkey* that the decided cases had not established a comprehensive rule of thumb by which to judge the true nature of advances made to a new enterprise, we there stated the following relevant criteria for making such a determination:

Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were the noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principal risks of loss attendant upon the adventure? Were payments of "principal and interest" on the notes subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when default of the notes occurred, attempt to enforce the obligations? [27 T.C. 59.]

Turning first to the capital and credit structure of New Baker as it existed in June 1961, respondent places strong emphasis on the gross disparity between New Baker's initial capital contribution of $5,000 and its initial indebtedness of almost $3½ million.[20] We must agree with respondent that with a debt-equity ratio of almost 700 to 1, New Baker was very thinly capitalized. However, the thin capitalization factor is "only one of the indicia from which the presence or absence of a debtor-creditor relationship may be determined," *Gooding Amusement Co.*, 23 T.C. 408, 419 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957), and the existence of that factor, standing alone, will not transform an otherwise valid indebtedness into equity capital. *J. I. Morgan, Inc.*, 30 T.C. 881, 891 (1958), reversed on other grounds 272 F. 2d 936 (C.A. 9, 1959); *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955).[21]

The Jerome Bros. partnership had been in the rendering business continuously since 1937. The record discloses that in the 5-year period prior to the 1961 transaction, the annual net sales of the business grew from $8 to $12 million. Although net earnings during the same period fluctuated widely, they too showed a decided upward trend. Inasmuch as six of the seven keymen were employed by the partnership in managerial and responsible administrative positions, they were in positions which made them keenly aware of the financial needs and busi-

---

[20] In addition to the indebtedness incurred by New Baker on June 26, 1961, in acquiring the partnership assets (the 15-year promissory note in the amount of $3,150,000 plus assumption of two real estate mortgages totaling $62,000), the corporation, on the same day, purchased a 50-percent interest in Kerman Tallow and San Joaquin Packing from the R. S. Wilson Co. for $250,500, evidenced by a 15-year, interest-bearing promissory note in that amount. Thus New Baker's indebtedness from these two acquisitions was $3,462,500, representing a debt to equity ratio of 692½ to 1.

[21] The point is best illustrated by the fact that the criteria recognized in the *Kolkey* case, for determining the true nature of advances to a new enterprise, arose in a case involving a thinly capitalized corporation. And see *Sun Properties* v. *United States*, where it was held that a bona fide indebtedness existed in spite of a debt to equity ratio of 310 to 1.

ness prospects of the company. The seventh keyman, Keith, had also gained an intimate knowledge of the business from his association as a 50-percent partner with the Jerome brothers in a manufacturing and engineering firm which was formed in 1954 and had continuously done work for the Jerome Bros. partnership, including the development of a continuous-operation cooking plant for the partnership's rendering business. The continuous-cooking process, which was to replace the conventional batch process, was in operation within a year after the 1961 transaction and permitted increased output and higher quality tallow at reduced costs. While the facts fail to disclose the magnitude of savings anticipated by installation of the continuous process or the degree which the keymen considered these savings in determining the size of annual principal and interest payments which the operations of the business could absorb, it is clear that Keith took an active part in the discussions leading up to the 1961 transaction and we think it a fair assumption that the expectation of reduced costs resulting from installation of the continuous process was considered by the keymen in deciding on the terms of the note. In addition, and prior to agreeing to a purchase price which would require New Baker to make annual principal and interest payments totaling $280,-000, Frederick, one of the keymen whose background was in business administration and accounting, set up a market program to determine the ability of the business to make payments on the Jerome Bros. partnership note out of projected future sales. Another keyman with an accounting background, Andreloi, prepared a cash-flow analysis based on projected earnings over a 10-year period and arrived at the conclusion that while the purchase price could not be paid off within 10 years, as the Jerome brothers desired, it could be paid off in 15 years. Andreoli's conclusion was reviewed and concurred in by Nelson, a third keyman with a business and accounting background, and reinforced by Frederick's marketing program. The decision to use a 15-year term on the note, which was ultimately accepted by the Jerome brothers, was not only initially suggested by the keymen but was based upon figures developed by them from their intimate knowledge of the business.

The financial success of the business in the 4 years subsequent to the 1961 transaction well attests to the sound business judgment exercised by the keymen in arriving at a 15-year payout period. Not only have all payments of both principal and interest on the note been timely made out of current earnings but the company's net sales have jumped from $12 million in 1961 to almost $49 million in 1965. Whereas the average annual net earnings for the 5-year period prior to the 1961 transaction were $72,200, they were $181,075 for the 4 years following the transaction, an increase of more than 150 percent.

In *Burr Oaks Corp.*, 43 T.C. 635, 647 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966), certiorari denied 385 U.S. 1007 (1967), we recognized that the transfer of property to a thinly capitalized corporation raises a "strong inference" that the transfer is an equity contribution where payment to the transferor depends "solely upon the success of an untried, under-capitalized business, the profits of which are uncertain." We think the opposite inference arises where, as in the instant case, the parties intended to and in fact did make principal and interest payments out of current earnings generated by the continued success of a well-established business which enjoyed not only a good past earnings' record but equally good prospects for the future. *Aqualane Shores, Inc.* v. *Commissioner*, 269 F. 2d 116, 120 (C.A. 5, 1959), affirming 30 T.C. 519 (1958). The property acquired by New Baker from the partnership was producing substantial income and the parties, based upon marketing projections, fairly believed that payments on the note could be made without impairing the capital assets of New Baker. The existence of these facts, in the light of the highly successful operations of the business subsequent to 1961, convinces us that New Baker's capital structure was not unrealistic at the time of the corporation's inception in 1961. Thus, there is no justification for inferring, on the sole ground of thin capitalization at least, that the promissory note is not what it purports to be.

We are further convinced that the note arose out of a transaction which was entered into for valid business reasons, was at arm's length, and was not a sham transaction. The record indicates that aside from any tax-saving considerations, the Jerome brothers had been concerned, for at least several years prior to 1961, with perpetuating the partnership business after their deaths. Having no family members in the top management of the business, they determined to transfer the entire business to a group of 10 individuals composed of themselves and 7 keymen, all of whom were familiar with the operations of the partnership business and had played an active role in its success. Since the keymen had only limited capital, it was necessary for New Baker to pay for the partnership assets out of future earnings. The testimony adduced at trial reveals that the dealings between the parties were bona fide and always at arm's length. Correspondingly, we do not interpret the multitude of facts surrounding the transaction as indicating an attempt by the Jerome brothers to transfer the business while at the same time retaining control thereof. In support of this interpretation we note that subsequent to the transaction, not only were the brothers minority stockholders, but they actually assumed less responsibility in the company's management while the keymen assumed increasingly more.

In resolving the issue before us, another controlling factor is whether the partners transferred partnership assets with reasonable expecta-

tions of repayment regardless of the success of the venture or whether, on the other hand, the transfer was made at the risk of the business. In an attempt to convince us that the 1961 transfer falls into the latter category and therefore resembles a contribution of risk capital as opposed to a loan, respondent relies heavily upon the fact that the partners subordinated their note to "creditors." We observe at the outset that the note was subordinated to only one of New Baker's creditors—the bank—not to "creditors" as respondent contends. Although the bank was a substantial creditor of New Baker, we do not feel the subordination of the note, in light of the facts existing in June 1961, prevents the note from constituting a true indebtedness. Had the Jerome brothers agreed to subordinate their note to the general creditors of New Baker a different result might obtain. Here, however, the bank had previously extended a line of credit to the business in excess of $3 million and had to adequately protect its interests. In order to preserve the availability of bank credit to New Baker, the Jerome brothers not only agreed to the required subordination but personally guaranteed New Baker's bank debt. The brothers realized the importance of their cooperation in this matter and, inasmuch as the subordination to a single creditor was agreed to for the sole purpose of assuring the continued financial health of the business, we cannot say that solely because of that subordination the note did not constitute a true evidence of indebtedness.

As indicated in the *Kolkey* case, another factor to be considered in determining the existence of true indebtedness is whether payments of principal and interest on the note are subordinated to corporate dividends. Where such subordination occurs, it indicates a treatment of the note not typical of that usually accorded a debt obligation. Here, however, no such subordination occurred. To the contrary the agreement of purchase and sale entered into between the Jerome brothers and New Baker specifically provided that so long as any part of the promissory note remained unpaid, the corporation was prohibited from indulging in numerous specified acts which might affect the security of the note, including "the payment of dividends in stock or cash." Pursuant to the agreement, New Baker has paid no dividends subsequent to June 1961. On the other hand, and to be accorded significance, is the fact that the corporation has never defaulted on any interest or principal payment required to be made under the note.

Also pertinent to our present inquiry is the degree of control retained by the noteholders over the business operations of New Baker. Continued control of a business by a noteholder is at least some indication that the transaction was no more than the mere shuffling of papers for the purpose of creating a tax advantage. Respondent has strongly contended that the agreement of purchase and sale entered into between the Jerome Bros. partnership and New Baker

so completely restricted New Baker's corporate activities that, in effect, the Jerome brothers retained full control over the business subsequent to June 1961. In spite of respondent's several arguments on this point, we do not think his conclusion is supported by the record. While it is true that the agreement of purchase and sale imposed numerous restrictions on New Baker, we think the reason for those restrictions was to protect the Jerome Bros. partnership, as a creditor of New Baker, from indiscriminate acts of management which might severely affect the corporation's ability to make timely interest and principal payments on the note. Of equal significance, however, is the fact that those restrictions are not of a nature which would permit the Jerome brothers to bind the corporation whenever and however desired. With regard to encumbering corporate assets and creating new debt, New Baker retained complete freedom provided it acted "in the usual and ordinary course of business." Similarly, New Baker was free to acquire new businesses and make loans provided the amounts of such transactions did not exceed $250,000 and $100,000, respectively. We search the record in vain for any significant evidence which might suggest that the brothers intended to retain effective control over New Baker after the 1961 transaction. Subsequent to June 1961, the keymen assumed more responsibility and control over the affairs of New Baker's business while the brothers, especially Frank, assumed less. This managerial transition was especially noticeable with respect to the keymen's increased contacts with New Baker's banker and attorneys. The brothers had agreed to sell the partnership assets to New Baker only after they were advised by counsel that if the keymen were permitted to each acquire a 10-percent interest in the business, the brothers would lose control inasmuch as their ownership would be reduced to 30 percent. In this respect we think it significant that not only did the keymen acquire 70 percent of New Baker's stock, but their voting rights were in no way restricted by voting trust agreements or otherwise. In fact, the company enjoyed its greatest financial success in the period subsequent to June 1961, under the increasing direction and control of the keymen.

Another factor supporting debt treatment is the disproportion between stock ownership and note ownership. At the end of 15 years, the Jerome brothers will have changed their relative ownership positions significantly. Instead of each owning a one-third interest in the business, they will each own only 10 percent. We have held that such substantial changes in ownership support the view that the note is representative of a bona fide indebtedness. *Charles E. Curry, supra.*

A final area of inquiry suggested by the *Kolkey* case is whether the price received by the noteholders was equivalent to the fair market value of the assets transferred. The record indicates that prior to

negotiations for the partnership assets, appraisals were prepared by a private appraisal concern covering most of the partnership assets. While those appraisals were based upon replacement cost rather than fair market value, the keymen who relied upon the appraisals during negotiations were well aware of what the appraisals represented. Considering the accounting and business background of the keymen, their knowledge of the sales and earnings record of the business they sought to purchase, and the length of time they spent negotiating with the brothers, we are convinced that the price they agreed to pay for the partnership assets was the result of arm's-length bargaining and in fact reflected a fair price for the property acquired.

In light of all the foregoing facts surrounding the issuance of the promissory note to the Jerome Bros. partnership in 1961, we are satisfied that the transfer of partnership assets to New Baker in exchange for the note was intended to, and did in fact, create a bona fide debtor-creditor relationship thereby entitling New Baker to deduct all interest payments made on the note.

## Issue 2

Within 5 days after New Baker acquired the assets from the Jerome Bros. partnership, consisting principally of stock in four corporations, it completely liquidated [22] two of those corporations, Old Baker and Kerman Tallow. New Baker then allocated the price it paid for the stock in those corporations to the assets received upon their liquidation and proceeded to use a stepped-up basis in computing depreciation, cost of goods sold, and loss on the subsequent sale of some of the assets acquired as a result of the liquidation.

New Baker justifies its use of a stepped-up basis on the ground that Old Baker and Kerman Tallow were liquidated pursuant to plans of liquidation which met all the requirements of sections 332 and 334 of the Code. Section 332(b) states the requirements which must be met in order that a corporate distribution shall be considered a complete liquidation. Section 334(b)(1), establishing the general basis rule in liquidation of corporate subsidiaries, provides that where property is received by the parent corporation in a distribution in complete liquidation of a subsidiary, the basis of the property in the hands of the parent shall be the same as it was in the hands of the subsidiary. However, in a line of pre-1954 cases, the leading one being *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F.

---

[22] Respondent contends that if New Baker is entitled to a stepped-up basis on the assets acquired upon the liquidation of Old Baker and Kerman Tallow, the basis of those assets should be reduced by an amount attributable to goodwill. However, respondent raises no issue with respect to the allocation of the total purchase price to each of the corporations New Baker acquired from the Jerome Bros. partnership, including Old Baker and Kerman Tallow.

2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951), the courts carved out an exception to the foregoing basis rule and held that where one corporation purchases the stock of another corporation for the sole purpose of obtaining assets of the second corporation by a prompt liquidation, the purchase would be treated as a purchase of the assets themselves rather than the stock, thereby giving the acquiring corporation a basis in the assets equal to the cost of the stock, rather than the adjusted basis of the assets appearing on the books of the subsidiary. The doctrine established in the *Kimbell-Diamond* case was codified in 1954 as section 334(b)(2) and provides in substance that the parent corporation's basis for property acquired in a section 332 transaction is the cost of the stock rather than the subsidiary's basis for the assets, provided that at least 80 percent of the stock was acquired by "purchase" during a period of not more than 12 months. However, in an apparent attempt to limit the availability of the stepped-up basis to stock acquired from unrelated persons, the term "purchase" was defined by section 334(b)(3) as follows:

SEC. 334(b) LIQUIDATION OF SUBSIDIARY.—

\* \* \* \* \* \* \*

(3) PURCHASE DEFINED.—For purposes of paragraph (2)(B), the term "purchase" means any acquisition of stock, but only if—

(A) the basis of the stock in the hands of the distributee is not determined (i) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, or (ii) under section 1014(a) (relating to property acquired from a decedent),

(B) the stock is not acquired in an exchange to which section 351 applies, and

(C) the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock.

Respondent, in disallowing to New Baker a stepped-up basis on the assets in question, contends that New Baker did not acquire the stock of Old Baker and Kerman Tallow in a manner which would satisfy any of the three subparagraphs of section 334(b)(3) defining "purchase." [23] Section 351(a) provides that—

SEC. 351(a). GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

Resolution of the question whether section 351 applies to the 1961 transaction requires, in turn, the two-fold determination of whether the stock of Old Baker and Kerman Tallow was transferred to New

---

[23] Inasmuch as the three subparagraphs which define "purchase" under sec. 334(b)(3) are written in the conjunctive, if any of these subparagraphs are applicable to the facts herein, no consideration need be given to either of the remaining subparagraphs.

Baker "solely in exchange for stock or securities" and if so, whether the transferor group was in "control" of the corporation, as defined in section 368(c), "immediately after the exchange."

We have previously determined under issue 1 that the promissory note given the Jerome Bros. partnership by New Baker in exchange for the partnership's stock and real estate did not evidence an investment of risk capital by the partnership in the nature of preferred stock. Thus, since the note was not "stock" within the meaning of "stock or securities" as used in section 351, we must now decide whether the note constituted a security. In *Wellington Fund, Inc.*, 4 T.C. 185, 189 (1944), we discussed the meaning of "securities" as follows:

The question of the meaning of the term "securities," as used in various revenue statutes, has been considered by the courts in a number of cases. The rule appears to be settled that, where such an act does not define the term [as is the case with section 351], it denotes an obligation of a character giving the creditor some assured participation in the business of the debtor, or, in other words, an investment in the business, and that the term does not include evidences of indebtedness for short term loans representing temporary advances for current corporate needs. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462; *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; certiorari denied 288 U.S. 599; *L. & E. Stirn, Inc.* v. *Commissioner*, 107 Fed. (2d) 390; *Commissioner* v. *Sisto Financial Corporation*, 139 Fed. (2d) 253.

More recently, in the case of *Camp Wolters Enterprises, Inc.*, 22 T.C. 737, 751 (1954), affd. 230 F. 2d 555 (C.A. 5, 1956), we adopted the following guide for determining whether a debt instrument satisfies the meaning of "securities" as used in section 351's predecessor, section 112(b)(5) of the 1939 Code:

Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section 112(b)(5) specifically includes both "stock" and "securities."

Application of the foregoing criteria to the note in question convinces us that the note constitutes a section 351 security. While admittedly not controlling, the fact that the term of the note is for 15 years itself strongly supports our conclusion. We have held promissory notes to be "securities" in other cases where the length of the note has been much shorter. *Daniel H. Burnham*, 33 B.T.A. 147 (1935), affd. 86 F. 2d 776 (C.A. 7, 1936), certiorari denied 300 U.S. 683 (1937), 10-year note; *Camp Wolters Enterprises, Inc., supra*, 5- to 9-year subordinated notes. More important, however, is the fact that the note in question, together with the agreement of purchase and sale, clearly secured to the noteholder, the Jerome Bros. partnership, the continuing participation in the business which is so characteristic of a security interest. Thus, until the note was paid in full, New Baker

could not, without the consent of the partnership, change the compensation of officers, declare stock or cash dividends, mortgage property except in the usual and ordinary course of business, amend the articles of incorporation, issue additional stock, create new debt or make loans above certain specified amounts, purchase stock of other businesses except within well-defined limits, enter partnership agreements, or merge with other corporations. While the intention of the Jerome brothers to continue their participation in the business was adequately secured by the foregoing restrictions, there is additional evidence to support our conclusion. Each of the brothers obtained for himself a 10-percent interest in the new business and continued to actively participate in the management of the business not only as directors, but also as key employees and officers.[24] The foregoing facts make it clear that the noteholders secured for themselves a significant degree of participation in New Baker's affairs before transferring their partnership assets to it. Considering all of the foregoing factors, we are compelled to hold that the promissory note in question falls within the meaning of "securities" as used in section 351.[25]

Having so determined, the only question remaining is whether, after the 1961 transfer of partnership assets to New Baker, the transferors were in control of the corporation as required by section 351. Control, for purposes of that section, is defined by section 368(c) as follows:

the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

Since New Baker's capital structure consists of 50 shares of issued and outstanding common stock, owned equally by 10 individuals, we must determine whether the transferor group owned at least 40 of the 50 shares after the transaction.

On or soon after June 23, 1961, each of the 10 men transferred $500 to New Baker in exchange for 10 percent of its stock. On June 26, 1961, New Baker entered into an agreement of purchase and sale pursuant to which the Jerome Bros. partnership transferred stock and real

---

[24] As of the time of trial, approximately 5 years after the 1961 transaction, Varney Jerome was general manager of Phoenix Tallow, Paul Jerome was general manager of New Baker's Albuquerque operations, and Frank Jerome was New Baker's president.

[25] Although the parties have not questioned whether the note received by the R. S. Wilson Co. for transferring its 50-percent stock ownership in Kerman Tallow to New Baker constituted a sec. 351 security, we think that in deciding whether or not sec. 334(b)(2) applies, that question must be answered. Both the note given the Wilson Co. for its interest in Kerman Tallow and the note given the Jerome Bros. partnership were dated June 26, 1961, were for terms of 15 years, imposed identical restrictions on New Baker until the note was paid off, and called for the periodic payment of principal and interest regardless of whether such payments could be paid out of current earnings and profits. In light of the similarities we must hold that the note received by the Wilson Co. similarly constituted a sec. 351 security.

estate to New Baker in exchange for a promissory note in the amount of $3,150,000 plus New Baker's assumption of certain partnership indebtedness in the amount of $62,000, for a total purchase price of $3,212,000. Also on June 26, 1961, the Wilson Co. transferred to New Baker a 50 percent stock interest in both Kerman Tallow and San Joaquin Packing in return for New Baker's note in the amount of $250,500. In determining whether the transferor group possessed the requisite control "immediately after the exchange," as required by section 351, we must decide who constituted that group, i.e., the 3 brothers, as petitioners contend, or all 10 men, plus the Wilson Co., as respondent contends. If respondent's contention is correct, the 80-percent control requirement of section 351 will obviously be satisfied inasmuch as the 10 men owned 100 percent of New Baker's stock "immediately after the exchange." The composition of the transferor group is dependent upon whether the transfer of cash for stock by all 10 men and the subsequent transfer of corporate stock and real estate by the Jerome Bros. partnership and stock by the Wilson Co. for New Baker's promissory notes are to be viewed as steps in a single transaction.

In *American Bantam Car Co.*, 11 T.C. 397, 405 (1948), affirmed per curiam 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950), the step-transaction theory was stated as follows:

In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a variety of tests. * * * Among the factors considered are the intent of the parties, the time element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?

Beginning with the regulations promulgated under the Revenue Act of 1934,[26] the Commissioner has likewise addressed himself to the question and similarly concluded that—

The phrase "immediately after the exchange" does not necessarily require simultaneous exchanges by two or more persons, but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure.

This definition has been continued without change in regulations under the subsequent Revenue Acts of 1936, 1938, 1939, and 1954.[27] Since it is now well settled that such a long-standing administrative interpretation applying to a substantially reenacted statute is deemed to have received congressional approval and has the effect of law, *National Lead Co.* v. *United States*, 252 U.S. 140, 146 (1920); *United*

---

[26] Art. 112(b)(5)–1, Regs. 86.

[27] Art. 112(b)(5)–1, Regs. 94 (1936); art. 112(b)(5)–1, Regs. 101 (1938); sec. 19.112 (b)(5)–1, Regs. 103 (1939); sec. 1.351–1(a)(1), Income Tax Regs.

*States* v. *Dakota-Montana Oil Co.*, 288 U.S. 459, 466 (1933); and *Commissioner* v. *Noel's Estate*, 380 U.S. 678, 682 (1965), we need only decide whether the several transfers to New Baker, although not simultaneous, were made pursuant to an agreement under which "the rights of the parties * * * [had] been previously defined" and which agreement was executed "with an expedition consistent with orderly procedure."

While the record fails to disclose the existence of any written agreement which sought to specifically define the rights and duties of the transferor group, the facts amply support the conclusion that as a result of lengthy negotiations prior to June 1961 between the keymen, the brothers, and Robert S. Wilson, the sole owner of the Wilson Co., a plan to transfer the Jerome Bros. partnership assets and the Wilson Co.'s interest in Kerman Tallow and San Joaquin Packing to a corporation to be owned equally by the three brothers and the keymen had been carefully formulated and agreed to by all the participants. There is no suggestion in the record that any aspect of the plan was left uncertain. If this is not so, it was incumbent upon petitioners to prove the contrary, and this they have failed to do. In light of this observation as well as the fact that the execution of the agreement proceeded with orderly dispatch, we are satisfied that within the transfer or group, "immediately after the exchange," there was "possessed" the requisite stock ownership in New Baker so as to bring the transaction within the language of section 351. Since New Baker acquired the stock in Old Baker and Kerman Tallow in an exchange to which section 351 applied, the stock in those subsidiaries was not acquired by "purchase" within the purview of section 334(b)(3)(B), and we must therefore hold that New Baker was not entitled to use a stepped-up basis in computing depreciation, cost of goods sold, and loss on the sale of some of the assets acquired from the liquidation of those subsidiaries.

Even if we had determined that the transaction by which New Baker acquired stock in Old Baker and Kerman Tallow constituted a sale rather than a section 351 exchange, New Baker would still not be entitled to a stepped-up basis on the assets received upon liquidation of those two subsidiaries. This follows from the fact that although section 334(b)(3)(B) would not apply, section 334(b)(3)(C) would. Petitioners concede that if Manchester Medical Hospital was in existence on June 26, 1961, and if triple attribution is permitted under the statute in question, New Baker would have acquired its stock in Old Baker and Kerman Tallow "from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock," thereby satisfying the requirement of section 334(b)(3)(C). Since we have held in issue 4, *infra*, that Manchester

was in existence as late as December 20, 1962, and also that triple attribution is required under the attribution statute in question (see issue 4), it follows that section 334(b)(3)(C) would apply so as to prevent New Baker from acquiring its stock in Old Baker and Kerman Tallow "by purchase." Thus, New Baker would not be allowed to allocate a stepped-up basis in the assets acquired upon liquidation of those two subsidiaries.

## Issue 3

In their individual income tax returns for the calendar years 1961 through 1963, Frank, Paul, and Varney Jerome each reported as long-term capital gain, the gain attributable to their distributive share of the principal payments received by their partnership from New Baker on the $3,150,000 promissory note. Respondent contends that the note evidenced a risk capital investment by the partnership and was therefore in the nature of preferred stock. It is therefore argued that the principal payments made on the note constituted dividends and were taxable as ordinary income to the individual petitioners. Petitioners, on the other hand, contend that the transfer of partnership assets to New Baker in 1961 constituted a bona fide sale and they are therefore entitled to long-term capital gain treatment on the principal payments. Our determination under issue 1, that the note constituted a true indebtedness and was not in the nature of preferred stock, disposes of respondent's contention. Similarly, our determination under issue 2, that the 1961 transaction constituted a nontaxable transfer pursuant to section 351, disposes of the authority upon which petitioners' contention rests inasmuch as it has been consistently held by this and other courts that the existence of a bona fide sale and the application of section 351 (as well as its predecessor under the 1939 Code, sec. 112(b)(5)), are mutually exclusive concepts. Cf. *Charles E. Curry*, 43 T.C. 667, 696–697 (1956), and cases there cited.

We are of the view, however, that petitioners' contention should be sustained on other grounds. Section 1232(a)(1)[28] provides, *inter alia*, that where a corporation issues a bond, note, or other evidence of indebtedness to a person in whose hands the indebtedness constitutes a capital asset, amounts received by the holder of the indebtedness shall be considered as amounts received "in exchange therefor." Since long-

[28] SEC. 1232, BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

term capital gain is defined by section 1222 as gain from the sale *or* exchange of a capital asset held for more than 6 months, and since the principal payments on the note were received "in exchange," it follows that petitioners are entitled to report gain from the receipt of each principal payment as long-term capital gain. *Edith K. Timken*, 6 T.C. 483 (1946), and *Howard Carleton Avery*, 13 T.C. 351 (1949).

## *Issue 4*

On December 20, 1962, New Baker acquired from the three Jerome brothers the entire stock of Veronica, a Panamanian corporation. Pursuant to a plan of complete liquidation adopted by Veronica's board of directors and ratified by its sole stockholder New Baker, Veronica was liquidated on December 31, 1962, and its assets, including an exclusive marketing agreement with Legaspi Oil Co., were transferred to New Baker. Pursuant to section 334(b)(2), New Baker allocated the purchase price of the Veronica stock to the assets acquired. Of the total purchase price of $1,100,000 for the Veronica stock, $350,000 was allocated to the marketing agreement. In its corporate tax return for the fiscal year ended June 30, 1963, New Baker claimed a deduction of $25,800 attributable to amortization of that agreement. Respondent disallowed the claimed deduction on the ground that since New Baker did not acquire the Veronica stock "by purchase," as required by section 334(b)(2), the basis provisions of that section were not available to it and New Baker's basis was therefore the same as it was on the books of Veronica, as provided by section 334(b)(1). In support of his disallowance, respondent specifically relies on section 334(b)(3)(C), which, when read in the context of section 334(b)(2), provides in substance that where a parent corporation acquires stock in a subsidiary from a person whose stock may be considered as owned by the parent under the attribution rules of section 318(a), the stock thus acquired will be deemed to have been acquired other than "by purchase," thereby precluding the parent from acquiring a step-up in basis on the assets received upon liquidation of the subsidiary. Thus, the narrow issue is whether New Baker, through the attribution rules of section 318(a), constructively owned the Veronica stock at the time of its acquisition on December 20, 1962. If so, that stock was not acquired "by purchase" and New Baker was therefore not entitled to take a stepped-up basis on the marketing agreement as the result of the liquidation of Veronica.

In order that ownership in the Veronica stock be attributed to New Baker pursuant to the rules of section 318(a), both Manchester Medical Hospital and Keith Engineering must have been in existence on

December 20, 1962. While petitioners do not question the existence of Keith Engineering, they contend that Manchester had ceased to exist long before December 1962. Petitioners attempt to support their contention on the ground that since the sole purpose of Manchester's existence was to own and operate a convalescent hospital, the sale of that hospital on March 1, 1961, necessarily terminated the partnership.

The facts bearing on this issue disclose that the sale of all of the assets of Manchester on March 1, 1961, was reported on the installment method. The purchaser, Southwest Community Hospital, gave Manchester a promissory note for the purchase price secured by a chattel mortgage and deed of trust on the hospital property.[29] Manchester thereafter filed tax returns for 1961 as well as for the period ended August 31, 1962, for the purpose of reporting the sale and installment collections received on the promissory note. Petitioners concede on brief that the 1962 partnership return reflected an unpaid balance of $12,500 on the promissory note received by Manchester from Southwest and further, that there had been no formal dissolution of the partnership. In *J. Milton Sorem*, 40 T.C. 206 (1963), reversed on other grounds 334 F. 2d 275 (C.A. 10, 1964), we were presented with the question whether section 318(a) applied to a partnership which, like Manchester, had ceased its business operations but continued to exist for the purpose of collecting money due the partnership. We there stated the following:

Petitioners admit that the partnership continued to exist until April 4, 1959, for the purpose of collecting and paying accounts, but maintain that *in retrospect*, it "transacted no active business" after September 26, 1958. For this reason petitioners urge us to disregard the partnership for sec. 318 purposes, grounding their argument on the theory that the partnership attribution rules may only be *realistically* applied to a partnership which not only has legal existence but also is actively carrying on a business. We are not persuaded by this line of reasoning. The partnership *existed* immediately after the redemption; for what purpose is immaterial. As we view the statute, attribution is required by virtue of the mere *existence* of a partnership relation between corporate shareholders, and business activity has nothing to do with it. Certainly sec. 318 itself makes no reference to "business activity" as a prerequisite for partnership attribution, and in the absence of convincing authority we are unwilling to add this judicial gloss to an already complex section of the Code. [40 T.C. 214–215 fn. 14.]

Inasmuch as the partnership continued to exist, at least for the purpose of receiving the unpaid balance on the promissory note, we must

---

[29] In an apparent attempt to prove that the promissory note had been paid in full, petitioners' attorney testified that his law firm had prepared a satisfaction of the chattel mortgage in February 1962. Whatever weight such a document might otherwise be entitled to, we do not think petitioners are entitled to a presumption that the promissory note had been paid off inasmuch as the record fails to disclose whether or not the satisfaction of the chattel mortgage was ever executed and delivered.

410

reject petitioners' contention and hold that on December 20, 1962, Manchester Medical Hospital was still winding up its corporate affairs and therefore was in existence for the purpose of applying the attribution rules of section 318(a).

Petitioners contend, however, that even if Manchester and Keith Engineering were in existence, section 318(a) should not be applied in this case because to do so would require triple attribution.[30] Petitioners reason that since Congress in 1964 eliminated sidewise or double attribution with regard to partnerships, estates, trusts, and corporations,[31] it follows that the 1964 statutory amendments were merely reflective of "what Congress originally contemplated," and thus "it seems clear Congress at no time intended Section 318(a) to be construed as permitting such multiple and compound attribution as that relied upon by respondent here." However seriously we may question the philosophy of employing triple attribution in a case such as this, we must, in the final analysis, accord to the relevant provisions of section 318(a) their usual and ordinary meaning. *Malat* v. *Riddell*, 383 U.S. 569 (1966). After carefully considering the legislative committee reports relating to the 1964 amendments,[32] we are convinced that those amendments were only intended to effect a change in the law subsequent to August 31, 1964, the date of their enactment. The legislative history bearing on this point in no way suggests that the purpose of amending section 318(a) might have been to clarify the meaning of that section. Congress, having become aware of the undesirable results permitted under existing law, sought to change that law. That being the case, we must reject petitioners' contention and hold that since both Manchester and Keith Engineering were in existence on December 20, 1962, for the purpose of applying section 318(a), New Baker was the constructive owner of the Veronica stock it acquired on that day and therefore it did not acquire that stock "by purchase" as required by section 334(b)(2). It follows that New Baker was not entitled to take a stepped-up basis on the marketing agreement it received upon liquidation of Veronica on December 31, 1962, and respondent's disallowance will accordingly be sustained.

*Decisions will be entered under Rule 50.*

---

[30] Inasmuch as the parties agree that a literal application of the relevant statutory provisions results in triple attribution, a technical explanation of that result in the context of the facts herein is unnecessary.

[31] Pub. L. 88–554 (Aug. 31, 1964).

[32] S. Rept. No. 1240, 88th Cong., 2d Sess. (July 24, 1964); H. Rept. No. 1844 (amend. 4), 88th Cong., 2d Sess. (Aug. 20, 1964).